F. Ray MARSHALL, etc., Plaintiff,
Appellant,

v.

ST. JOHN VALLEY SECURITY HOME,
Defendant, Appellee.

No. 76–1415.

United States Court of Appeals,
First Circuit.

Argued Dec. 9, 1976.

Decided June 20, 1977.

Frank V. McDermott, Jr., Atty., Boston, Mass., with whom William J. Kilberg, Sol. of Labor, Carin Ann Clauss, Associate Sol., Helen Judd, Atty., Washington, D. C., and Albert H. Ross, Regional Sol., Boston, Mass., were on brief, for appellant.

John M. Wallach, Bangor, Me., with whom Gerald E. Rudman, Gene Carter and Rudman, Rudman & Carter, Bangor, Me., were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The Secretary of Labor appeals from a judgment dismissing his complaint against defendant St. John Valley Security Home (the Home) for alleged violations of the equal pay provisions of the Fair Labor Standards Act, 29 U.S.C. § 206(d)(1).[1] After hearing two days of testimony, the court issued a comprehensive opinion containing extensive findings of fact, in which it held that the Home "has not violated the equal pay provisions" of the Act.

Review in a case such as this is limited to whether the district court's findings of fact are clearly erroneous, *Brennan v. Owensboro-Daviess County Hospital,* 523 F.2d 1013, 1015 (6th Cir. 1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976); *Hodgson v. Brookhaven General Hospital,* 470 F.2d 729, 730 (5th Cir. 1972); *Schultz v. Wheaton Glass Co.,* 421 F.2d 259, 267 (3d Cir.), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), or whether it applied an incorrect legal standard, *Brennan v. Prince William Hospital Corp.,* 503 F.2d 282, 285 (4th Cir. 1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). The Secretary does not allege legal error as such but vigorously contends that the district court misconceived and misinterpreted the controlling facts. While the case is close, we are satisfied that the district court's findings, many of them tied to its evaluation of the credibility of witnesses, were not clearly erroneous. We therefore affirm.

At the trial, the Secretary sought to show that the Home discriminates between certain of its employees on the basis of sex by paying its female nurse's aides and assistants[2] at an hourly rate less than that paid to its male ambulance attendants and orderlies for work which requires "equal skill, effort and responsibility". 29 U.S.C. § 206(d)(1). Nurse's aides, who require no formal training, provide personal services for female patients. They serve meals, assist patients with feeding, cleaning and dressing themselves, change and make beds, and care for soiled clothing. They are required to report anything new or unusual in a patient's appearance to the nurse in charge, and, in the case of an emergency, may not administer aid themselves but must alert a qualified person. Nurse's assistants distribute medications prescribed for all patients, female and male, take and record patient's vital signs, change bandages, and administer enemas. With several exceptions, most nurse's aides and assist-

---

1. Section 206(d)(1) provides:

   "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

2. In addition to nurse's aides and assistants, the Home received the services of registered and licensed nurses. Their pay, presumably much higher because of their extensive professional training, is not an issue here.

ants were compensated, prior to an October 1975 pay raise, at an hourly rate in the range of $2.00–2.20.

The ambulance attendants were employed by the Home under its contract with the Town of Madawaska to provide ambulance service. One ambulance attendant (and an ambulance driver) must be on duty at all times, ready to respond to an ambulance call. While the ambulance attendants were untrained prior to joining the Home's staff, each of the incumbent attendants who testified said that he had taken at least one of the first aid or emergency medical treatment courses satisfying state licensing requirements. When responding to an emergency call, the attendant, who is unaccompanied by a physician or nurse, must determine the proper on-scene care and administer it skillfully. When not on duty in the ambulance responding to a call, the attendant performs orderly work in the Home. The district court found that as orderlies "the ambulance attendants perform for male patients essentially the same duties of personal care which nurse's aides perform for female patients." Most of the attendants had been hired in 1973 at $2.50/hour, and by October 1975 their rates had been increased to $3.15 or $3.20.

The district court concluded that the Secretary had failed to establish that the female nurse's aides and assistants and the male ambulance attendants perform equal work within the meaning of 29 U.S.C. § 206(d)(1). The emergency care duties performed by the ambulance attendants, the court observed, "require substantially higher levels of skill, effort and responsibility than are ever required of nurse's aides and assistants." It noted the medical judgment required, the effort in transporting patients and the lack of supervision. That the attendants spend less than 2% of their working time on the ambulance was not considered significant. The court reasoned that the essence of an attendant's job is to be on call at all times during his shift to discharge ambulance duties which require a higher degree of skill, effort and responsibility.

The court then turned to three individual employees who figured specially in the Secretary's case. The employment history of two, Robert Michaud and James Chartier, bear some similarities. Michaud was hired in August 1974, as an ambulance driver at a rate of $1.61/hour. In March 1975, he took on additional duties as an orderly, and from that date until just prior to trial, Michaud was compensated at a split rate: $3.15/hour for time spent as an orderly and $2.00/hour for time spent actually driving the ambulance. The Home's bookkeeper, Mrs. Gabourie, testified that when she was told Michaud was going to be working as an orderly she "considered that he was to be paid at the higher rate, and . . . didn't consult Mr. Dugal". When Mr. Dugal, the Administrator of the Home, discovered that Michaud was receiving $3.20/hour for his orderly work, he reduced Michaud's rate to $2.30, the rate being paid to drivers. Chartier was hired in September 1975, one month prior to trial, as an ambulance driver at the going rate of $2.30/hour. He testified that after a week on the job, Mr. Dugal and Mrs. Martin, the Director of Nursing Service, informed him that he was going to start performing orderly work for which he would be paid $3.15/hour. However, his first paycheck computed at the higher rate was taken back by Mr. Dugal, who said, according to Chartier, that the rate for his orderly work was going to be $2.30/hour for a 90-day probationary period, to be raised to $3.15 if he "proved" himself. Mr. Dugal told a different story. He said Chartier was hired at $2.30/hour, and that issuance of the check at the higher rate was a bookkeeping error. The check was recovered immediately. Mr. Dugal added that he might have told Chartier that he would be considered in the future as an ambulance attendant at $3.30/hour.

The district court ruled that the Secretary had made out a prima facie case that Michaud and Chartier were paid more than the nurse's aides and assistants for equal work. This finding shifted to the Home the burden of showing that the wage differential was based on a factor other than sex. *Corning Glass Works v. Brennan*, 417 U.S.

188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), a burden which the court went on to find had been met. Pointing to the Home's "unsophisticated" and "irregular" personnel practices, the court credited the testimony of Mr. Dugal, Mrs. Martin and Mrs. Gabourie that Michaud collected a higher rate of pay for six months and Chartier was issued a check computed at a higher rate solely as a result of administrative error and not according to a discriminatory compensation practice.

The third employee dealt with separately by the court was Normand Ringuette. Ringuette was not called by the Secretary, but Mr. Dugal and Mrs. Martin testified to his employment. Ringuette held a special position in the Home. Hired in 1961, Ringuette served as the only male orderly in the Home until 1973 when the ambulance attendants were first hired. He is the highest paid nonprofessional employee, receiving $1.00 to $1.50/hour more than the typical nurse's aide. He had prior experience as an orderly in the Canadian army. As an orderly, the court observed, Ringuette "performs for male patients substantially the same personal care services which nurse's aides perform for female patients". However, Ringuette seems to have greater responsibility; the court noted that unlike the other orderlies and aides he reports not to a floor nurse but directly to the head nurse, and he is responsible for training new orderlies.

The court expressed some difficulty in deciding whether Ringuette's work was equal to that performed by the nurse's aides and assistants. But even if so, the court concluded that Ringuette's higher pay was justified by his long tenure and unique status which involved greater responsibilities.

We turn first to the Secretary's challenge to the finding that the higher rate for the ambulance attendants was justified on the ground that they perform emergency care duties requiring greater skill, effort and responsibility. Pointing to Michaud, Chartier and Ringuette, he argues that not every male orderly compensated at the higher rate performed duties as an ambulance attendant. This argument overlooks the court's findings, which we affirm, *infra,* that Michaud and Chartier were offered the higher pay only briefly because of an error, and that Ringuette's pay was, in fact, justified.

The Secretary also argues that three of the ambulance attendants, Dugal (the nephew of the Administrator), Charette and Albert, "could not perform the skilled emergency procedures relied on by the trial court as justifying the higher rate paid to all of them." Dugal and Charette are alleged to have "had only the most minimal first aid training", no more than that possessed by several of the nurse's aides. The question, however, is not just training but their actual duties. Dugal's testimony indicated that he was fully capable of rendering, and did render, emergency care. He testified to going out on numerous unsupervised calls as the attendant and having to render emergency aid to individuals with broken limbs and other severe injuries. Presumably Charette did the same; it was not shown that he performed less capably than Dugal or the other attendants.

■ The evidence concerning Paul Albert's employment as an ambulance attendant is more troublesome. Albert was hired in September 1973 at a rate of $2.50/hour. After a 3-month probationary period, he was given a raise to $3.00/hour. He left the Home voluntarily in March 1974. The evidence shows that Albert never took a first-aid or emergency medical treatment course, as did the other attendants, and never gave medical aid. Most of his time was spent working as an orderly. On the other hand, he testified to going out on the ambulance on an average of once a week, including one call to the scene of an automobile accident; he understood that he needed training to acquire state licensing and continue as an attendant; and he testified that the reason he never took a course was that no course was offered during the brief period that he was with the Home. Presumably if he had worked out, he would have taken his training, and gone out on emergencies more often. Given the short

duration of his hire, and some evidence that he was a marginal employee who never worked into his intended duties, we conclude that the circumstances surrounding Albert's employment do not establish clear error by the district court in finding that the higher rate for ambulance attendants was based on their having to perform duties requiring a higher degree of skill, effort and responsibility. *Compare Schultz v. Wheaton Glass Co., supra,* 421 F.2d at 263–64.

■ We turn next to the Secretary's challenge to the findings concerning Michaud, Chartier and Ringuette. Disputing the finding of administrative mistake, the Secretary argues that Michaud, already on the payroll as an ambulance driver with time on his hands between calls, would never have assumed the additional tasks of an orderly in March 1975, except for extra pay.[3] This argument was never made to the district court; neither party in examining Michaud, Dugal or Mrs. Martin inquired as to what prompted him to take on orderly work. All that his testimony reveals is that he was hired in late 1974 as an ambulance driver and moved to a position as an orderly in March 1975. Balanced against the speculative possibility that the Home promised him a pay increase is the testimony of the bookkeeper to the effect that she "considered he was to be paid at the higher rate" when informed that he was performing orderly work and the fact that as soon as Mr. Dugal discovered Michaud was being paid at the higher rate, his rate was reduced to that for an ambulance driver. It is not reassuring that the reduction occurred just days before trial. On the other hand the Home's policies were found to have been "unsophisticated" and "irregular", and Michaud seems to have been the first orderly besides Ringuette who was not an ambulance attendant. The issue of mistake was fully litigated before the district judge, and his findings cannot be said to be clearly wrong.

■ Nor do we find the court's findings as to Chartier clearly erroneous. The Secretary points only to Chartier's testimony that he was told he would receive the higher rate after a 90-day probationary period as showing the weakness in the district court's finding. But the district court explicitly accepted Mr. Dugal's version of the discussion between him and Chartier. His version was that Chartier was hired as a driver-orderly at $2.30/hour, was never promised any higher rate, and received the check computed at the higher rate as a result of another error by the bookkeeper. It was for the district court to choose between the conflicting testimony of Chartier and Dugal.

■ Finally, there is the question of Ringuette. With respect to this employee, the district court observed,

> "The Secretary did not present any evidence with respect to Ringuette's duties. Nor does the record disclose how much skill, effort or responsibility his duties may require. It is difficult, therefore, to determine whether Ringuette's work is 'equal' to that performed by the nurse's aides and assistants. But whether or not the Secretary has met his burden of showing that Ringuette performs 'equal work,' it is clear that the Home has shown that he receives the higher wage for reasons other than sex."

We need not linger over the Secretary's argument that he in fact made out a prima facie showing of equal work; even if he did, the district court was not clearly erroneous in concluding that factors other than sex, including seniority and special usefulness, accounted for Ringuette's higher pay. The Secretary argues that the Home cannot rely on seniority since there was no demonstrated seniority "system" applicable to both men and women; nurse's aides typically received no more than a twenty cent premium after two years for seniority. *See 29*

---

3. We do not consider whether the argument may not, from the Secretary's viewpoint, be counterproductive; if ambulance driving alone was worth $2.30 an hour, would not the addi-tion of extra duties justify more under the Act? *Compare Schultz v. Wheaton Glass Co.,* 421 F.2d 259, 262 (6th Cir.), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

C.F.R. § 800.142 (1976). It is clear, however, that the Home's personnel policies were utterly informal; and we think Ringuette's pay can be justified as reflecting a blend of seniority and special usefulness rather than maleness. The court noted that Cecile Martin, a nurse's aide with six years' experience, was paid $2.60/hour as contrasted with the typical aide's hourly rate of $2.00–$2.20. That other aides with longer tenure than hers were compensated at only $2.20 shows that seniority alone was not determinative, but could be taken to confirm the importance of the second factor, the special value of particular employees.

The court spoke of Ringuette's skill, of his superior training and experience, and of his special responsibilities. The Secretary argues that the only testimony to suggest that Ringuette was a specially valuable employee is Mrs. Martin's statement that he is "well qualified . . . very reliable . . . very responsible" and asserts that testimony of subjective evaluations of employee merit is inadequate to show that Ringuette's pay is based on factors other than sex. *See Hodgson v. Brookhaven General Hospital,* 436 F.2d 719, 726 (5th Cir. 1970). However, the duration of his employment and the granting of a raise when he made good on a threat to quit if not paid more suggested that he was regarded as especially valuable. For many years he was the only orderly at the Home, and there was evidence that he now trained new orderlies and reported only to the head nurse. We cannot find clear error in the court's findings that sex was not determinative in Ringuette's case given his unique employment history and the evidence that he had carved out for himself a special niche at the Home as a particularly useful senior employee.

It is regrettable that a case of this character has required so much judicial time, largely because of inefficient practices of defendant appellee. Our affirmance of the district court is not to be taken as commendatory of such practices, and if the district court, and ourselves, should be less tolerant on a subsequent occasion, it must not be found surprising.

*Affirmed.*