**Arlene HORNER, Appellant,**

v.

**MARY INSTITUTE, a corporation, Appellee.**

No. 79–1352.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 7, 1979.

Decided Jan. 14, 1980.

708

Nancy S. Everett, Anderson, Everett, Sedey & Van Amburg, St. Louis, Mo., for appellant.

Timothy L. Stalnaker, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for appellee.

Before GIBSON, Chief Judge,* STEPHENSON and HENLEY, Circuit Judges.

STEPHENSON, Circuit Judge.

Arlene Horner, a female teacher, appeals from a judgment in favor of Mary Insti-

___

* The Honorable Floyd R. Gibson was Chief Judge of the Eighth Circuit at the time this case was submitted, and took senior status on December 31, 1979, before the opinion was filed.

tute, her private school employer. Horner sued Mary Institute under the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), for back pay, liquidated damages, and compensation for reasonable attorney's fees and costs. The district court,[1] after receiving testimony, exhibits, and the briefs of both parties, entered judgment for Mary Institute. The court held that Horner had failed to establish a prima facie case that Mary Institute had violated the Act by discriminating in payment of wages on the basis of sex. The court further held that any prima facie showing had been rebutted.

Horner's claim below was that she and male teachers employed at Mary Institute had jobs that were performed under similar working conditions and that required substantially equal skill, effort, responsibility, but that the males were paid higher salaries. Horner mainly relied on a comparison between her job as a physical education teacher and the job of Ralph Thorne, another physical education teacher at Mary Institute. The district court found that while Horner received lower salaries than Thorne's,[2] Thorne "was a credit to the school and outstanding on the faculty" whereas plaintiff "was not a particularly innovative teacher." On the basis of these and other findings, which compared other male and female salaries within Mary Institute, the court found there was no factual basis for Horner's charge that hiring and promotion at Mary Institute were related to sex.

Horner's contention on appeal is that the district court misapplied the Equal Pay Act and made clearly erroneous findings of fact. We affirm the court's judgment.

I. Factual Background

Defendant Mary Institute is a not-for-profit corporation which operates three private schools. Its lower school, called the Beasley School, is for boys and girls in grades K through 4. Its middle school is for girls in grades 5 through 8. Its upper school is for young women in grades 9 through 12. Each school has a head who reports to the administrative head of Mary Institute.

During the years relevant to this action, Mary Institute's administrative heads were Headmaster James P. Stearns, who resigned in July 1976, and Headmistress Edes P. Wilson, who has administered Mary Institute ever since. Stearns was responsible for setting faculty salaries for academic years 1974–75, 1975–76, and 1976–77. Wilson has had that responsibility for academic years 1977–78 and 1978–79.

Mary Institute's physical education department consists of four or five teachers. One teaches primarily in the Beasley School, the rest teach primarily in the middle and upper schools. One teacher in the department acts as department head and as such receives a five hundred dollar annual bonus for assuming administrative duties.

A. *Initial Salaries*

Headmaster Stearns hired teachers for the 1974–75 academic year in the early months of 1974. He hired Horner on March 11 to teach in the middle and upper schools. Horner had a Bachelor of Science degree in physical education, with some work completed toward a Master's. She had two years of part-time experience in teaching physical education to students ranging from ages eleven through adult. She had also taught, full-time, one summer session of general science to high school students. The court found she was not certified to teach in the Missouri public schools. Stearns offered Horner a starting salary of $7,500 which she accepted. Her previous

---

1. The Honorable James H. Meredith, United States District Judge for the Eastern District of Missouri.

2. The salaries of Horner and Thorne for the school years beginning in the year indicated were as follows:

|        | 1974    | 1975   | 1976   | 1977   | 1978   |
|--------|---------|--------|--------|--------|--------|
| Horner | $ 7,500 | 8,100  | 8,600  | 9,000  | 10,200 |
| Thorne | $ 9,000 | 10,400 | 11,100 | 11,800 | 12,600 |

salary, for her part-time work, had been $3,500.

In the same spring, Stearns hired a male physical education teacher, Dan Casey, at an identical $7,500 salary, and a female physical education teacher, Carol Diggs, at a salary of $6,500. Both Casey and Diggs, like Horner, were hired primarily to teach in the middle and upper schools. Casey received an additional $1,500 for teaching water sports at the neighboring Country Day School.[3] Casey left Mary Institute after the 1974–75 year. Cynthia Gill, a female physical education teacher hired for the following year, received a salary of $7,700. Diggs, during the period in question, had two children attending Mary Institute for whom she paid no tuition, which would have been $2,000–$2,500 per pupil per year.

Horner was one of four teachers whose basic duty was to teach physical education in the middle and upper schools. In her first year, Horner was assigned by the head of the department of physical education to set up and implement a gymnastics program in the winter trimester. She also supervised recess at the Beasley School, coached junior varsity field hockey in the fall and varsity tennis in the spring, and assisted in the upper school's May Day pageant.[4] Horner did not have the ultimate responsibility of determining curriculum; that responsibility belonged to the department head.

Late in the spring of 1974, after the customary hiring period had elapsed, Headmaster Stearns learned that the physical education teacher at the Beasley School would not be returning in the fall. The resigning teacher left virtually no formal physical education curriculum, apart from the swimming program, and the Beasley School had virtually no athletic equipment. Stearns needed a replacement who could set up and implement a Beasley School physical education curriculum. Stearns' search led him to Ralph Thorne, whom he hired on June 3. Thorne had a Bachelor of Science degree in education and was certified to teach in the Missouri public schools. He had two years of full-time experience in teaching physical education to boys and girls in grades K through 6 at the Twillman Elementary School in the Hazelwood School District. The principal at Twillman gave Thorne the highest ratings on his evaluation form, which Thorne had forwarded to Stearns. The principal commented, "Recommend Re-employment! Mr. Thorne's work at Twillman School has been most satisfactory! He has been successful in generating a great deal of enthusiasm among the students for P.E." Stearns offered Thorne a starting salary of $7,500, the same salary he had offered Horner and Casey. Thorne was interested in the job, because it would afford him an opportunity to "set up a curriculum that [he] felt strongly about, and to pursue things [he had] always wanted to [pursue]." But Thorne did not accept Stearns' offer because his current salary at Twillman was over $8,000 and because he expected his new salary there would be $9,000. Stearns then got authorization from Mary Institute's governing board to offer Thorne $9,000, which Thorne accepted.[5]

3. Plaintiff alleges the district court clearly erred in finding that Country Day School, rather than Mary Institute, paid Casey the $1,500 for teaching water sports. But it appears that Mary Institute and Country Day School were involved in an exchange of faculty services (Casey's water sport teaching for a Country Day School teacher's science teaching). The actual source of Casey's additional stipend is therefore not material. What is material is that Casey was paid but $7,500 to perform the duties of a middle and upper school physical education teacher, and that the district court was not clearly erroneous in finding that Casey received the $1,500 bonus for assuming duties beyond these.

4. The district court's findings of fact did not describe the extent of Horner's job duties except to state that she "was one of several physical education teachers in the Middle and Upper Schools." Our description of Horner's duties is derived from the transcript of her oral testimony before the district court.

5. On two prior occasions, other faculty members had rejected Stearns' initial offer and had then accepted an increased offer. Both of these faculty were women.

Thorne was the only physical education teacher assigned primarily to the Beasley School. In his first year, Thorne's duties were to coach junior varsity basketball, to teach swimming and physical education in the Beasley School, and, most significant here, to set up the Beasley School's physical education curriculum. Thorne reported directly to the Beasley School head as well as to the head of the physical education department. Thorne was also required to report on his Beasley School programs at the annual Parents' Day convocation, in conjunction with the department head's report on the overall physical education program.

### B. *Subsequent Salaries*

Mary Institute has no formal faculty salary schedule. Each spring the administrative head takes the sum budgeted by Mary Institute's governing board and allocates it among faculty salaries for the coming academic year. In determining individual salaries the administrative head considers personal reactions, the reactions of students, parents, and faculty, and the recommendations of department and school heads. In the last two years Headmistress Wilson has relied on evaluation forms, with seventeen criteria, to assist her assessment of faculty performance.

For the years 1975–76, 1976–77, and 1977–78, Thorne received annual salary increases that were $200–$800 higher than those received by Horner. *See* note 2 *supra.* For the year 1978–79, Horner received a raise $400 higher than Thorne's.

The largest discrepancy between salary increases occurred for the academic year 1975–76. Stearns and Thorne met to discuss Thorne's salary for that year in the spring of 1975. During his first year Thorne had, in addition to fulfilling his responsibilities, introduced the President's Physical Fitness Test and a Beasley School field day, an intramural athletic event. Stearns was pleased with Thorne's performance and wanted to induce him to stay. In response to Stearns' initial offer, however, Thorne reported that he had been asked by his previous public school employer to interview for a teaching position that would include a head coaching job. Thorne anticipated that the salary for that position would be higher than the salary Stearns was offering. Following the discussion, Stearns made a second offer, of $10,400, which Thorne accepted.

Meanwhile, Stearns and Horner met to discuss her new salary. During her first year Horner had initiated an after-school gymnastics club. Stearns was concerned, however, that Horner was not enthusiastic enough in supporting the school's athletic teams and that she left school during her free periods. He did not, however, inform her of his specific criticisms. Stearns offered Horner a raise of $600, or eight percent, to $8,100. Horner accepted Stearns' offer.

For the next two years, 1976–77 and 1977–78, Thorne received raises of $700 each year and Horner received raises of $500 and $400, respectively.

Horner's job duties for the two years following her initial year remained about the same. In the 1977–78 year, however, she assumed additional duties. She set up, in response to parental suggestions, intermural field hockey and tennis programs. She began to help supervise the school's renascent intramural sports program. She continued the after-school gymnastics club, was faculty adviser to eight students in the upper school, and chaired the school's curriculum committee.

The dean of the upper school reported to Headmistress Wilson that Horner's performance was satisfactory, but the school's college counselor reported that "he wished that she would spend more time with her students." The dean of the middle school was concerned about an apparent lack of enthusiasm in the physical education department. During 1977–78, however, Headmistress Wilson noted "a dramatic change" in Horner's contribution to the school, which she ascribed principally to Horner's work as chair of the curriculum committee. For the following year Horner received a $1,200 raise.

Thorne's job duties for the years following his initial year underwent continual expansion. In the 1975–76 year Thorne retained his prior responsibilities and introduced a varsity track and field team for the middle and upper schools. He also instituted an annual float trip and a Beasley School swim day. In the 1976–77 year Thorne again retained his prior responsibilities and introduced intramural floor hockey at the Beasley School. In the 1977–78 year Thorne once more retained his prior responsibilities. He taught a current events class in the upper school, served on the electives and activities committee, and established a Beasley School intermural program. Finally, in the 1978–79 year, Thorne, in addition to retaining prior responsibilities, established and coached the varsity cross-country and soccer team and was faculty adviser to ten students in the upper school.

The head of the Beasley School commended Thorne's performance as prompt, enthusiastic, and innovative. In the 1976–77 year, Thorne's varsity track team was the first Mary Institute team to enter state competition. The dean of students in the upper school, and the dean and coordinator of the middle school, gave "very positive" reports on Thorne. Reactions of parents to Thorne were also positive. In late 1977, one parent, "particularly pleased with the work Mr. Thorne had done with his children," gave $30,000 to Mary Institute's endowment fund and another $20,000 to be used for the Beasley School's physical education program and the middle and Beasley School's track and gymnastics programs. The parent had had a son at the Beasley School and a daughter in middle school track and gymnastics.

C. *Faculty and Administrative Salaries Generally*

Figures compiled for the purpose of administering Mary Institute's pension fund for about fifteen male and fifty-five female employees reveal higher average salaries for the males.[6] The figures are skewed, however, by the inclusion of the salaries of about twelve female clerical workers (whose salary range is lower than that of faculty members), the exclusion of the salary of Headmistress Wilson (who is the highest paid person at Mary Institute but who is not in the pension plan), and by the inclusion of the $17,000 salary of the male maintenance engineer. Further, about fifty percent of the male faculty but only about twenty percent of the female faculty have administrative responsibilities in addition to teaching responsibilities. Giving little weight to the pension fund figures, the district court compared specific faculty jobs within Mary Institute. For example, it found that Berkeley Gunther, the female dean of the middle school, and Harvey Sperling, the male dean of students, held comparable positions and that each earned $16,900 per year. Sperling had had more experience as dean. The court also found that Jackie Jundt, the female head of the Beasley School, who earned $16,000, had held her administrative post for a shorter period than Gunther or Sperling.

The court made additional findings relating to faculty salaries generally. The court found that Headmistress Wilson "is and has been a nationally respected spokeswoman for the cause of equal rights and equal pay for women." He credited her testimony and that of Headmaster Stearns to the effect that their decisions on pay were not based on sex. The court found, in reliance on Stearns' deposition testimony, that the Independent School Association of the Central States had examined Mary Institute's pay practices during Stearns' administration and had concluded that they were in compliance with the Equal Pay Act. The court apparently discounted the testimony of Horner and of two other female teachers that Stearns or Wilson had acknowledged to them that Mary Institute had had a policy of paying males more than females. One of the other teachers, Nancy Linn, had recently been terminated from employment

---

6. For example, as of July 1, 1977, the average male salary for pension plan members was $14,354, the average female salary, $10,331.

at Mary Institute. The other teacher, Marie Globig, was in her nineteenth year as a biology teacher at Mary Institute.

## II. Application of the Equal Pay Act

█ Under the Equal Pay Act, Mary Institute is forbidden to discriminate

between employees on the basis of sex by paying wages to employees * * * at a rate less than the rate at which [it] pays wages to employees of the opposite sex * * * for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex * * *.

29 U.S.C. § 206(d)(1). For purposes of the Act, "equal" means "substantially equal"; male and female jobs may be compared even if they are not identical. See, e. g., Peltier v. City of Fargo, 533 F.2d 374, 377 (8th Cir. 1976); 29 C.F.R. §§ 800.120, .122 (1978).[7] If a plaintiff shows that an employer has paid males and females different wages for substantially equal work, the employer then must show that one of section 206(d)(1)'s four exceptions applies. See Corning Glass Works v. Brennan, 417 U.S. 188, 195–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); Ridgway v. United Hospitals-Miller Division, 563 F.2d 923, 926 (8th Cir. 1977); 29 C.F.R. § 800.141 (1978).

As to the portion of Horner's claim that is based on a comparison between her job and that of Thorne, there is no dispute that Mary Institute paid different wages to Horner and Thorne. The only questions are (1) whether their jobs were substantially equal and (2) if so, whether the wage differential was related to sex. The district court held, in effect, that the jobs were not substantially equal and announced that, in the event that the issue were reached, it would·find

the difference in their wages was due to factors other than sex.

█ Our duty in reviewing these determinations is to uphold them unless they are "clearly erroneous." Fed.R.Civ.P. 52. This standard of review does not permit us to substitute our own impressions for those of the district court.

It is not enough that we might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent. * * We are not given those choices, because our mandate is not to set aside findings of fact "unless clearly erroneous."

*United States v. National Association of Real Estate Boards*, 339 U.S. 485, 495–96, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950) (citations omitted). The appellant's burden of showing clearly erroneous findings is especially great where, as here, the findings are primarily based upon oral testimony. *St. Louis Typographical Union No. 8 v. Herald Co.*, 402 F.2d 553, 557 (8th Cir. 1968).

█ Horner asserts some inaccuracies in the district court's findings of basic facts and attacks the findings as inadequate because they do not detail and compare the job requirements of Horner and Thorne. Instead, complains Horner, the findings focus on Thorne's allegedly superior job performance. We agree that the district court's findings are not as detailed as they should be. But we do not agree that the court's ultimate findings are clearly erroneous. A lack of specific findings is not necessarily ground for reversal or remand where an understanding of the issues may be gleaned from a review of the record on appeal. *See Janzen v. Goos*, 302 F.2d 421, 424 (8th Cir. 1962); 5A Moore's Federal Practice ¶ 52.06[2], at 2718–23 & n.2.

### A. Initial Salaries

█ Our review of the record reveals there was substantial evidence to support

---

**7.** The Department of Labor has issued interpretive regulations under the Equal Pay Act, see 29 C.F.R. §§ 800.100–.166 (1978), which

"should be given weight and serve as guidance to the courts." *Hodgson v. Security Nat'l Bank*, 460 F.2d 57, 59 (8th Cir. 1972).

the district court's conclusion that Horner had failed to show that her job required substantially equal "skill, effort, and responsibility" as that of Thorne. The jobs are superficially identical in that both involve teaching of physical education. And Mary Institute has, for recruiting purposes, used a leaflet that describes the general duties of a "Teacher of Physical Education, Grades K–12." But "[t]he consideration of equal pay standards is based on actual job requirements and performance, not on-job classifications or titles." *Peltier v. City of Fargo, supra*, 533 F.2d at 377; *accord*, 29 C.F.R. § 800.121 (1978). The district court was not clearly erroneous in finding that the work actually required of Thorne was different from that actually required of Horner.

During a three day trial, the district court heard the oral testimony of Headmistress Wilson, Horner, Thorne, and other employees of Mary Institute. It received the deposition of Wilson and of former Headmaster Stearns. There was ample testimony for the court to conclude that Thorne's job was not substantially equal to Horner's in terms of "skill" or "responsibility." Thorne was to develop and implement a physical education curriculum for children in grades K through 4. Horner, by contrast, was to teach courses selected by someone else. There was evidence from which the court could conclude that Thorne's job required more experience, training, and ability, all of which are factors to consider in determining whether jobs require substantially equal "skill" under the Equal Pay Act. *See* 29 C.F.R. § 800.125 (1978).[8]

There was also evidence to find that Thorne's job was not substantially equal to Horner's in terms of "responsibility." Thorne reported directly to his school head and to parents on his physical education programs. The district court was entitled to conclude that his job differed from Horner's in terms of degree of accountability and the importance of job obligation. *See* 29 C.F.R. § 800.129 (1978).

What is more, the evidence before the district court justifies its conclusion that "if for any reason it can be said that plaintiff did make a prima facie case," the defendant rebutted it. Headmaster Stearns attempted to hire Thorne at the same $7,500 salary at which he had hired other teachers, both male and female, but Thorne rejected Stearns' offer because he thought he could command a $9,000 salary at Twillman Elementary School. There is evidence to find that Stearns met Thorne's demand not because Thorne was male but because Thorne's experience and ability made him the best person available for the job and because a higher salary was necessary to hire him. The differential was based on a factor other than sex. *See* 29 U.S.C. § 206(d)(1)(iv).

Although an employer's perception that women would generally work for less than will men is not a justification for paying women less, *see Corning Glass Works v. Brennan, supra*, 417 U.S. at 205, 94 S.Ct. 2223, it is our view that an employer may consider the market place value of the skills of a particular individual when determining his or her salary. *See generally Christensen v. Iowa*, 563 F.2d 353, 356 (8th Cir. 1977).

## B. *Subsequent Salaries*

During 1974–78, Thorne's job grew while Horner's, until recently, was relatively static. While retaining his curriculum responsibilities, Thorne instituted several special annual events, introduced three varsity athlet-

---

8. Horner, already hired for another job at Mary Institute, was not considered for the Beasley School job and claims she was discriminated against in hiring on the basis of sex. We cannot say the district court was clearly erroneous in not accepting her charge. There was substantial evidence to conclude that Thorne's job called for utilization of the experience and ability he had acquired in his two years of full-time experience as a gym teacher in an elementary school. Thorne's elementary school principal gave him an enthusiastic recommendation for this kind of work. There was no evidence that Horner was qualified for the job in the same demonstrable degree.

ic teams, and established an intermural athletic program and an intramural floor hockey program at the Beasley School. Horner, by contrast, appears to have assumed no significant new responsibilities until 1977–78, when she helped supervise the intramural program, instituted intermural field hockey and tennis, and served for a time as chair of the curriculum committee. Our conclusion that the district court was justified in finding that Horner and Thorne were hired to fill different jobs therefore applies with even greater force for the years subsequent to their initial employment.

Because Horner failed to establish that her job was substantially equal to that of Thorne, the amount by which Thorne's salary exceeded hers is not relevant under the Equal Pay Act.[9] "Congress did not intend to put either the Secretary [of Labor] or the courts in the business of evaluating jobs and determining what constituted a proper differential for unequal work." *Hodgson v. Corning Glass Works,* 474 F.2d 226, 231 (2d Cir. 1973), *aff'd,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). We note that judicial determination of the relative economic value of unequal work may be particularly ill-advised in the context of faculty salaries in a private school.

We therefore conclude the district court was justified in holding that Horner had not made out a prima facie case of sex discrimination. The court had substantial evidence upon which to find that Thorne's job was not substantially equal to Horner's in terms of skill, effort, and responsibility.

### C. *Faculty Salaries Generally*

Apart from the comparison of her job with that of Thorne, Horner relies on pension fund figures that indicate males earn higher average salaries at Mary Institute than do females. That fact is relevant, however, only in connection with a showing that the figures represent wages paid males and females for substantially equal jobs. Horner made no such showing. The district court found that these figures were influenced by such factors as the inclusion of lower-paid female clerical workers and higher-paid male administrators and a maintenance engineer. The concentration of men in one job and women in a substantially different job does not make out a case under the Equal Pay Act. *See* 29 C.F.R. § 800.120 (1978). Horner does not attack either the district court's explanation of the pension fund figures or its specific comparisons of male and female salaries, from which it concluded that Horner had made out no prima facie case under the Act. We cannot say the district court was clearly erroneous in making these determinations.

### D. *Attorney's Fees*

While our affirmance of the district court makes it unnecessary to consider Horner's arguments concerning liquidated damages and attorney's fees under 29 U.S.C. § 216, we are met with Mary Institute's contention that it is entitled to attorney's fees as the prevailing party on appeal. But Mary Institute points to no specific statute that would authorize an award to the prevailing defendant or appellee in an Equal Pay Act case. Nor does Mary Institute attempt to show that Horner's appeal was motivated by anything other than an earnest belief that she was a victim of sex discrimination. We cannot say that Horner's contentions were devoid of merit or otherwise reflective of bad faith. *See Mosby v. Webster College,* 563 F.2d 901, 905 (8th Cir. 1977) (denial of attorney's fees to prevailing defendant in Title VII case).

Judgment affirmed.

---

**9.** The amount of the differential may, of course, be relevant if the jobs involved have been shown to be equal and the employer is attempting to establish the absence of sex as a factor. In that case, the employer may have to show "a reasonable relationship between the amount of the differential and the weight properly attributable to the factor other than sex." 29 C.F.R. § 800.143 (1978).