Carol D. SELIGSON, Plaintiff,

v.

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Defendant.**

Civ. A. No. 83–4024–N.

United States District Court,
D. Massachusetts.

March 25, 1987.

Joan A. Lukey, Hale & Dorr, Boston, Mass., for plaintiff.

Robert E. Sullivan, Palmer & Dodge, Boston, Mass., for defendant.

## MEMORANDUM AND JUDGMENT

DAVID S. NELSON, District Judge.

The plaintiff Carol D. Seligson brought this action on December 16, 1983 against defendant Massachusetts Institute of Technology ("MIT") alleging that it had wrongfully terminated her employment as a regional director of the MIT Alumni Association.

In November, 1986, this matter was tried before a jury on four counts: the Equal Pay Act, 29 U.S.C. § 206(d)(1), the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (advisory jury), the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, and retaliatory termination

under the foregoing acts. On November 10, 1986, the jury returned a verdict in favor of MIT and the court adopted the jury's verdict on the Title VII claim.

The court now enters its findings of fact and rulings of law supporting its determination of the Title VII count.

### FINDINGS OF FACT

1. Plaintiff Carol D. Seligson was hired by the defendant Massachusetts Institute of Technology as a regional director for the Gulf Atlantic region in January, 1980.

2. There are five regional director positions at the Alumni Association. Four of the regional directors, New England, Gulf Atlantic, Mid-West and West, work out of the Cambridge office of the Alumni Association located on the MIT campus. The New York regional director works out of the Alumni Center in New York.

3. The New York regional director has additional duties and responsibilities to those of the other regional directors. The New York regional director administers the New York Alumni Center and is responsible for operating budgets, financial reports and office management of the Center (Ex. 1) and for supervision of the staff of the New York office. The regional directors located in Cambridge did not have any such additional responsibilities or duties.

4. At the time plaintiff was interviewed, the Alumni Association was only looking for regional directors for both the Gulf Atlantic and Mid-West regions.[1] When asked if she had a preference for one region over the other, she said she did not.

5. Plaintiff was a 1971 graduate of MIT and from time to time, she did volunteer work for her alma mater. Prior to accepting the position at MIT, she had three years' experience as an independent financial consultant selling investment instruments to employee groups.

6. Plaintiff was interviewed for the regional director position by Ronald Stone, Director of Operations for the Alumni As-

sociation. During the interview plaintiff stated that her minimum salary requirement was $24,000.

7. Having obtained approval from the MIT personnel department, Mr. Stone hired plaintiff as regional director of the Gulf Atlantic region at a salary of $24,000. Upon accepting the position, plaintiff requested and was paid an additional $2,000 for moving expenses and was allowed $1,000 in relocation expenses.

8. Larry Milan, who was hired as regional director for the Mid-West region at the same time plaintiff was hired, had a bachelor's degree and a master's degree in education and administration. Prior to being hired as a regional director, Mr. Milan had three years' working experience at the State University of New York as assistant to the president and assistant to the vice president for student affairs. Additionally, he had two years of experience at the MIT personnel office. Mr. Milan was hired at a salary of $23,000.

9. In August, 1979, MIT hired Paul Johnson to be the regional director of the New England region. Mr. Johnson had a bachelor's and master's degree and a certificate from Harvard University School of Business Administration. He had sixteen years of business experience, including some twelve years spent at MIT. One of the reasons that Mr. Johnson was hired for the New England position was to develop the so-called "Enterprise Forum." The purpose of the Enterprise Forum was to organize workshop programs to review and critique new businesses. Mr. Johnson was hired, in part, to develop that program in New England and to help transfer the Enterprise Forum concept to other regions. During his tenure as regional director, he helped set up Enterprise Forums in the plaintiff's region, among others. Mr. Johnson also had other duties that were unique to the New England Region, and, because MIT is located in New England, his contact with alumni was more intensive than the other regional director's. Mr. Johnson's starting salary was $31,500, which exceed-

1. At the time plaintiff was hired, the regional directorship in New York became vacant. Ac-

cordingly, the plaintiff was never considered for such position.

ed the usual salary range for a regional director's position. Mr. Johnson left the position of regional director for New England to become the regional director for the Gulf Atlantic region. However, he continued to maintain the responsibilities of managing the Enterprise Forum and eventually became its full-time director. This position, the court finds, was not substantially equal to plaintiff's position. The court further finds that Mr. Johnson's salary was essentially based upon an evaluation of his relevant experience which was, indeed, greater than plaintiff's.

10. The only other regional director in place at the time plaintiff was hired was Robert Blake, the regional director of the West region. Mr. Blake had been a regional director since the positions were established in 1976. At the time he was hired in 1976 he also had several years of experience as an MIT personnel officer.

11. In May, 1981, the Alumni Association hired Benjamin Franklin Smith to be the New York regional director. Smith had a master's degree from MIT. Mr. Smith had been the Director of Alumni Affairs at Tulane University. Additionally, he had been an Assistant Professor and Associate Dean at the Tulane School of Architecture. Mr. Smith was hired at a salary of $37,500. Based on Mr. Smith's credentials and the unique nature and responsibilities of the New York regional director position, the court finds that Mr. Smith was a much more experienced candidate than was plaintiff and that the position for which Mr. Smith was hired was not substantially equal to that for which plaintiff was hired.

12. Plaintiff received her first performance review in April, 1980 and was awarded the highest percentage raise. The only difficulties raised by Mr. Stone in this review concerned her aloofness in the office and her uneveness in dealing with others in the office.

13. In November of that year, Mr. Stone spoke with plaintiff concerning other problems with regard to her performance. He specifically cited her failure to meet a deadline which had, at that time, seriously inconvenienced him. He was upset when she missed such an important deadline without speaking to him because she had previously expressed her disdain at being "bugged" about deadlines. Mr. Stone's practice was to impose deadlines on all the regional directors and to follow up if the deadlines were not met. Mr. Stone testified that he spoke with plaintiff regarding certain other interpersonal difficulties and advised her that other staff people commented on their difficulties working with her.

14. In May, 1980, the Alumni Association decided to take Philadelphia out of the New York region and put it in Gulf Atlantic. After plaintiff learned of this change she asked for a salary increase. Mr. Stone told her that he did not believe that an increase was warranted at that time, citing the fact that she had just received a ten percent (10%) increase and the fact that the additional territory did not represent much additional work and could be offset by reallocating some of her time spent in other cities in her area.

15. In April, 1981, plaintiff was reviewed again. She, as before, received the highest percentage increase. Part of the increase was to compensate her for taking on Philadelphia. Again, the only negative comment with respect to her performance concerned her interpersonal skills. Mr. Stone told Ms. Seligson that her inability to work with her colleagues was causing problems.

16. Although plaintiff was rated highly with respect to the technical aspects of her performance, she was regarded by her colleagues and co-workers as a difficult person with whom to work. Nancy Russel Wohl and Brenda Hambleton who worked at the Alumni Association while plaintiff was there, testified that plaintiff had particular difficulty dealing with support staff, especially secretaries. She treated them, as one former regional director testified, as second-class citizens and on more than one occasion shouted at them. Even Joseph Collins, the Director of the Alumni Fund, who in 1982 rated plaintiff the top performer based on the numbers she generated in

her region, testified that he was relieved to see plaintiff leave because of the poor effect she had on the office morale.

17. Plaintiff's immediate supervisor, Ron Stone, came to believe that she was very unhappy in Boston and that she was displeased with her living situation. Indeed, at one point plaintiff told Mr. Stone that she was considering not returning to Boston.

18. In addition to the interpersonal difficulties, there was a concern on the part of the Alumni Association that plaintiff was not committed to the job. The four regional directors who were based in Boston were expected to spend about 25–30% of their time in their regions. Plaintiff, while she maintained an apartment in Boston, also maintained a home in Baltimore and continued to carry on business activities in Baltimore, unrelated to her work for MIT, for which she took $6,000 in income tax deductions (Ex. 33). These deductions reflect a considerable amount of non-MIT activity in the area of her home in Baltimore. Mr. Stone expressed his concern that she maintained a rather limited schedule with respect to her MIT responsibilities while in the Baltimore–Washington area.

19. On September 1, 1981, plaintiff met with Mr. Hecht and Mr. Stone and told them that she was resigning and that she would start her search immediately for a new job. Mr. Hecht told her that he would be her contact person in the Alumni Association until she left.

20. In the fall of 1981, Mr. Hecht twice inquired of plaintiff how her job search was progressing and offered to assist her in finding a new job. She stated that she was still looking for a job, and reiterated her intention to leave.

21. In December, 1981, Shirley Picardi became the secretary of the Alumni Association. Hers was a new position which combined the positions formerly held by Jim Hester and Ron Stone.

22. Because Ms. Picardi had not formerly worked at the Alumni Association, she spent a great deal of her time with all the regional directors including plaintiff, learning about their jobs.

23. She traveled with the regional directors to meetings in their regions. When she attempted to learn about plaintiff's territory, Ms. Picardi found her difficult and uncooperative.

24. Mr. Hecht informed Ms. Picardi when she came to the Alumni Association that plaintiff had resigned and would be leaving soon. Mr. Hecht also told Ms. Picardi that he had been plaintiff's contact with respect to her departure plans and that he would continue to act as such.

25. In the spring of 1982, the annual performance review was completed. Ms. Picardi, who was responsible for the review of each of the regional directors, did not recommend an increase for Ms. Seligson. She understood that the plaintiff was leaving and that spending her limited resources on the plaintiff was unwarranted under this circumstance. Instead, she attempted to encourage the plaintiff to find another job. Ms. Picardi also testified that she encouraged the plaintiffs to find another job because she concluded that Ms. Seligson was not a "team player" and that it was difficult for others to work with her. (Ex. 12). Mr. Hecht approved Ms. Picardi's recommendation. Mr. Hecht testified that by the end of the fall, 1981, he had already concluded that plaintiff, regardless of her own intentions, would have to leave the Alumni Association.

26. On May 12, 1982, Ms. Picardi gave plaintiff her review in plaintiff's office. Plaintiff reacted to the review by shouting at Ms. Picardi and criticizing her management style. Ms. Picardi testified that as a result of her conduct during the review, she considered plaintiff terminated.

27. The day after the review, Friday, May 13, 1982, plaintiff flew to Baltimore and filed a charge with the EEOC (Ex. 13).

28. When she returned to Boston, she wrote a letter to Bill Hecht asking him to review the decision not to give her a salary increase. She did not tell Mr. Hecht that she had filed a charge with the EEOC (Ex. 16).

29. In response to the plaintiff's letter questioning why she was not given a salary increase, Mr. Hecht met with her on May 28, 1982 and informed her that no raise would be forthcoming because he had expected her to have left by this point in time. He noted that her delay in departure was costly to the Association.

30. On June 4, 1982, after consulting with Mr. Hecht and the personnel department, Ms. Picardi wrote plaintiff a letter (Ex. 20) informing her that taking an indefinite amount of time to leave the Association was unacceptable because of the planning needs of the Association. Ms. Picardi pointed out that the fall was going to be a very busy time, and particularly so in the plaintiff's region. She further informed the plaintiff that it was important to have a new regional director in place by September 1, 1982. She thereupon set a date of August 31, 1982 as the time for plaintiff to leave—a notice approximately three months in advance.

31. On June 11, 1982, MIT received its first notice that Ms. Seligson had filed a charge with the EEOC (Ex. 38).

32. On July 9, 1982, Ms. Seligson filed an amended charge with the Massachusetts Commission Against Discrimination. Between June 11 and July 19, 1982, the plaintiff avoided communicating with Mr. Hecht and Ms. Picardi. As a result, her lack of communication began to interfere with the Association's planning for the upcoming major fall conferences in the Gulf Atlantic region.

33. On July 19, 1982, plaintiff met with Mr. Hecht and Ms. Picardi in Mr. Hecht's office. Mr. Hecht informed plaintiff that because of the deteriorating relationship within the office, they wanted her to relinquish her duties as of July 21, 1982. Plaintiff's salary was to continue through August 31, 1982. At the time this decision was made, Mr. Hecht and Ms. Picardi were unaware that an amended charge had been filed.

34. Plaintiff, after consulting with her attorney, left on July 19, 1982.

## RULINGS OF LAW

1. Title VII of the Civil Rights Act of 1964 (hereinafter called "Title VII") makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1).

2. The plaintiff alleges that MIT discriminated against her on the basis of sex because she was paid less than employees doing substantially equal work, was denied pay increases despite her job performance, and was subjected to a hostile work environment. She further claims that MIT unlawfully terminated her employment in retaliation for her filing a charge with the EEOC.

3. In Title VII cases alleging discriminatory treatment, the plaintiff bears the burden of proving by the preponderance of the evidence a prima facie case of discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason. *Id.* at 253, 101 S.Ct. at 1093. Should the defendant meet its burden, the plaintiff must show by the preponderance of the evidence that the defendant's reasons were pretextual, that is, not the true reasons for the employment decision in question. *Id.*

## EQUAL PAY CLAIM

4. The plaintiff first claims that she was paid wages lower than those paid male employees performing substantially equal work. To establish a prima facie case of sex discrimination under this claim, the plaintiff may utilize the criteria needed to establish a violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1) (1982), and accordingly she bears the burden of proving that she was paid less in wages than her male counterparts who were performing work requiring substantially equal skill, effort, and responsibility under similar work-

ing conditions. *Marcoux v. State of Maine,* 797 F.2d 1100, 1106 (1st Cir.1986).[2]

■ 5. In determining which jobs are substantially equal, the court must look to actual job requirements and performance. *Horner v. Mary Institute,* 613 F.2d 706, 714 (8th Cir.1980), (citing *Peltier v. City of Fargo,* 533 F.2d 374, 377 (8th Cir.1976)).

6. With respect to the other regional director's jobs, the court finds that the Mid–West region position held by Larry Milan was substantially equal to plaintiff's, as was the West regional director position held by Robert Blake. At the time plaintiff was hired, there were two regional director positions open, the Gulf Atlantic and the Mid–West. Plaintiff was asked if she had a preference for one region over the other. Mr. Milan, hired a month after plaintiff to be the Mid–West regional director, was paid $23,000, one thousand less than Ms. Seligson. Mr. Blake, hired in 1976, was making $26,500 in 1980 when plaintiff was hired.

■ 7. The court finds that the New York regional director's job was not substantially equal to plaintiff's position. This position was located in New York, rather than in Cambridge as was plaintiff's. Additionally, the New York regional director had substantial additional responsibilities for administering the Alumni Center, preparing budgets and supervising the New York staff. There was testimony that the Alumni Association had concluded that the New York position required a much more senior person than was required in the other positions (Ex. 1). Plaintiff had no duties comparable to the additional duties of the New York regional director. Thus,

this court finds that based on the duties, responsibilities, experience required of the New York position, that the position for which Mr. Smith was hired in 1981 was not substantially equal to plaintiff's position. *Horner,* 613 F.2d at 714.

8. The New England regional director position presents a closer question. There was testimony that when Mr. Johnson was hired the Alumni Association was looking for someone who could develop the "Enterprise Forum," a program to critique new and developing businesses as well as other programs unique to the New England region. There was also testimony that Mr. Johnson helped plaintiff establish the Enterprise Forum in plaintiff's region. The court finds that at the time plaintiff was hired the New England regional director position was not substantially equal to the position for which Ms. Seligson was hired. This finding is also supported by the fact that Mr. Johnson took his Enterprise Forum duties with him when he left the New England position and he eventually became the full-time director for the Enterprise Forum.

■ 9. However, even if the New England and New York positions were found to be substantially equal to plaintiff's position, the court finds that the defendant had demonstrated that the pay disparity with respect to those positions as well as Mr. Blake's was based on factors other than sex.

10. Mr. Smith, who was hired for the New York position in 1981, was a former director of Alumni Affairs for Tulane University. Additionally he was a professor of architecture and Associate Dean at the Tu-

2. A disagreement has arisen among the courts governing the allocation of the burden of proof in equal pay claims under Title VII, in that once a plaintiff establishes a prima facie case, the issue remains whether the burden then shifts to the defendant to prove one of four defenses under the Equal Pay Act or whether the defendant need only articulate a legitimate nondiscriminatory reason for the disparity under the traditional Title VII allocation, with the burden remaining at all times with the plaintiff. *Compare Kouba v. Allstate Insurance Co.,* 691 F.2d 873, 875 (9th Cir.1982) with *EEOC v. Sears, Roebuck & Co.,* 628 F.Supp. 1264, 1328–32 (N.D.

Ill.1986). The First Circuit has not yet decided this issue. *Marcoux v. State of Maine,* 797 F.2d 1100, 1106 (1st Cir.1986). In the instant case, both parties agreed that the traditional Title VII analysis is the correct one for equal pay claims brought under Title VII. Neither side objected to the instructions to the advisory jury on this count. Additionally, the court agrees with the reasoning of the court in *EEOC v. Sears, Roebuck,* and finds that the traditional Title VII allocation is appropriate. It should also be noted that the jury found for the defendant on the claim under the Equal Pay Act, using the appropriate allocation of proof under the Act.

lane School of Architecture. Ron Stone who hired Mr. Smith testified that this experience was very important for the regional director's position in that it gave him a perspective on the faculty point of view in a university.

11. There was also substantial credible testimony about Mr. Johnson's relevant experience, and why, based on this experience, MIT offered him a salary in excess of the normal range for the regional director position. Mr. Stone testified that Mr. Johnson's experience in developing and managing new programs was particularly important in light of the duties it was anticipated that he would undertake with respect to the Enterprise Forum. Mr. Johnson had sixteen years of business experience including twelve years at MIT. Both Mr. Johnson and Mr. Smith were clearly more experienced candidates than was plaintiff and MIT was entitled, in an exercise of its business judgment, to consider and place a value on that experience in setting their salaries. *EEOC v. Aetna Insurance Co.,* 616 F.2d 719, 722, 726 (4th Cir.1980); *Horner,* 613 F.2d at 714; *Wear v. Webb Co.,* 572 F.Supp. 1257, 1260 (D.Minn.1983); *Walter v. KFGO Radio,* 518 F.Supp. 1309, 1318 (D.N.D.1981).

■ 12. With respect to Mr. Blake, the regional director for the West Region, the court finds that the difference between his salary and that paid plaintiff resulted from his four years' experience on the job rather than his sex. A pay differential which results from time on the job does not violate Title VII. *Marshall v. St. John Valley Security Home,* 560 F.2d 12, 17 (1st Cir.1977); *Schutz v. Western Publishing Co.,* 609 F.Supp. 888, 906 (N.D.Ill.1985); *EEOC v. Aetna Insurance Co.,* 616 F.2d at 723–26.

13. The plaintiff also contends that MIT took advantage of market conditions indicating that historically women can be hired for lower wages than men and hence have a lower impression of self-worth. *Corning Glass Works v. Brennan,* 417 U.S. 188, 205, 94 S.Ct. 2223, 2233, 41 L.Ed.2d 1 (1974). In *Corning,* the court found that the differential in pay among men night inspectors and women day inspectors "arose simply because men would not work at the low rates paid women inspectors, and it reflected a job market in which Corning could pay women less than men for the same work." *Id.* In the present case, the plaintiff's evidence fails to prove that MIT took advantage of market conditions unfavorable to women. The plaintiff, an intelligent and educated woman, cannot be heard to complain that she was forced to assume a competitive and desirable managerial position at wages her male counterparts would not accept. As previously indicated, her salary compared favorably with her similarly situated male counterparts, Mr. Milan and Mr. Blake. Moreover, the evidence is lacking with respect to Ms. Seligson's low impression of self-worth. Rather than taking advantage of impermissible market conditions, MIT considered factors other than sex in setting her salary, i.e., her background and prior work experience. Thus, the court finds that plaintiff's equal pay claim under Title VII fails.

### DENIAL OF SALARY INCREASE

■ 14. With respect to Ms. Seligson's claim regarding the denial of a salary increase in May, 1982, the court finds that Ms. Seligson was in fact denied a salary increase while her male colleagues were given an increase. However, the court also finds that MIT articulated a legitimate nondiscriminatory reason for the decision not to give her a salary increase. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–256, 101 S.Ct. 1089, 1093–1095, 67 L.Ed.2d 207 (1981). Ms. Seligson had expressed her intention to leave the Alumni Association. Additionally, although plaintiff's performance in some respects was excellent, she was judged by her colleagues and supervisors, both male and female, to be divisive and a difficult person with whom to work. Her stated intention to leave coupled with the Association's growing displeasure at Ms. Seligson's inability to work compatibly with her colleagues and support staff led to the decision not to give her an increase as a means to encourage her to effectuate her

decision to leave. The court finds this to be a legitimate nondiscriminatory reason. Plaintiff has failed to show that the reason proffered by MIT was a pretext for discrimination.

## SEXUAL HARASSMENT

■ 15. Ms. Seligson has also claimed that she was harassed because of her sex by being monitored and interrogated about her personal life while her male colleagues were not. The court finds that Ms. Seligson has failed to prove her harassment claim under the standard announced in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 2406.

Plaintiff testified that she was interrogated about her personal life by her supervisor Ron Stone and that her work was monitored in a way that was different from the treatment accorded male employees. Ron Stone, her supervisor, testified that he never asked plaintiff questions regarding her marital status or personal life. He further testified that he reviewed all the regional director's travel schedules and imposed and followed up on deadlines on everyone. The court credits Mr. Stone's testimony. The court finds that Ron Stone's comments to plaintiff related to legitimate concerns about scheduling trips to her area, her meeting deadlines and her problems with other employees in the alumni office. Further, the court finds that there was no showing that these comments altered the conditions of plaintiff's employment. 106 S.Ct. at 2406.

## RETALIATORY DISCHARGE

■ 16. Finally, Ms. Seligson claims that she was terminated in retaliation for filing a charge with the EEOC. In order to prevail on this claim, plaintiff must show that (1) she engaged in the protected activity, (2) she was subsequently discharged from her employment, and (3) there is a causal connection between the discharge and the protected activity. *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F.Supp. 318, 324 (D.Mass.) *aff'd*, 545 F.2d 222 (1st Cir.1976). The court finds that Ms. Seligson failed to prove her claim of retaliation with respect to the decision to terminate her.

■ Mr. Hecht testified that by the end of the fall, 1981, he had decided that plaintiff had to leave the Association. The court finds that when the Association gave plaintiff notice of the date by which she had to leave, they were not aware of the pending charge. On June 4, 1982, Ms. Picardi wrote Ms. Seligson telling her that she had to leave the Association by August 31, 1982. The Association did not receive notice of the charge of discrimination until June 11, 1982 (Ex. 38). After her May 12, 1982 review, plaintiff went to Baltimore to file an EEOC charge. She did not tell Ms. Picardi or Mr. Hecht that she filed the charge. Further, Ms. Picardi testified that after the May 12, 1982 meeting concerning Ms. Seligson's review, during which Ms. Seligson yelled at Ms. Picardi and criticized her competence, Ms. Picardi considered Ms. Seligson "out the door." It must have been clear to plaintiff after the May 12th review that her time at the Alumni Association was limited. Plaintiff cannot protect herself from the inevitable by filing a charge and then claiming her termination was retaliatory.

17. On July 19, 1982, Ms. Seligson was told to relinquish her responsibilities as of July 21, 1982 although she would continue to be paid until August 31, 1982. The court finds that this decision was motivated by the concerns over the deteriorating relationships in the office and by concern that Ms. Seligson was discussing her claim with alumni within her region and not because of her charge with the EEOC.

18. Inasmuch as Ms. Seligson has failed to bear her burden of proving that MIT's reasons were pretextual, the Court rules that her filing a claim with the EEOC was not causally connected with or otherwise a determinative factor resulting in her discharge.

19. Finding that plaintiff has not met her ultimate burden with respect to any of her Title VII claims, the court hereby enters judgment in favor of the defendant MIT.