Judith D. SCHUTZ, Plaintiff,

v.

WESTERN PUBLISHING COMPANY, Defendant.

No. 83 C 8646.

United States District Court, N.D. Illinois, E.D.

May 29, 1985.

Dawn M. Cassie, Hamman, Benn & Miller, Chicago, Ill., for plaintiff.

Randi C. Hammer, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Robert E. Williams, Barbara L. Neilson, McGuiness & Williams, Washington, D.C., for defendant.

## MEMORANDUM ORDER

BUA, District Judge.

The above-captioned matter came before the Court for trial on the merits of plaintiff's Complaint. The Court, having heard testimony on September 24, 25 and 26, 1985, and having reviewed exhibits and post-trial briefs submitted by the parties, does hereby enter the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

1. This case arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e through 2000e–17, and the Equal Pay Act of 1963, 29 U.S.C. § 206(d). The plaintiff, Judith D. Schutz, seeks damages for alleged violations of these statutes.

2. Schutz is a woman residing in the Northern District of Illinois. The defendant, Western Publishing Company, Inc. ("Western"), is a Delaware corporation whose principal place of business is in Racine, Wisconsin. Western employs more than 200 persons and is engaged in an industry affecting commerce. Western, originally an independent national publishing company, was owned by Mattel, Inc.,

from 1979 through February 1984, and is presently owned by R.A.B. Holdings, Inc., a Delaware corporation owned by Richard A. Bernstein. Among other things, Western is engaged in the merchandising and selling of various publications.

3. Plaintiff was employed by Western from February 7, 1978, to February 9, 1983. She alleges in her complaint that during this period she was the victim of unlawful employment discrimination based on her sex. She specifically alleges that she was discriminated against in termination, promotions, and the payment of bonuses in violation of Title VII, and in compensation in violation of the Equal Pay Act.

4. Plaintiff was initially hired by Western in 1978 as a "Retail Specialist" in the Consumer Products Sales division. She held that position until February 1981. During this period, Western hired approximately equal numbers of men and women as Retail Specialists.

5. As a Retail Specialist, plaintiff was assigned to work primarily with accounts designated as "trade" accounts. Trade accounts, in Western's parlance, are generally bookstores or department stores with separate book departments. Their purchases from Western typically consist primarily of books priced over ninety-five cents.

6. Most, if not all, of the other Retail Specialists employed by Western during this period were assigned to work primarily with accounts designated as "field" or "consumer products" accounts. Field accounts included a wide range of department stores, toy stores, drug stores, discount stores, variety stores and chains that purchase from the full line of Western's consumer products, including games, puzzles, coloring books, activity products and inexpensive story books for children, as well as higher-priced books in some instances.

7. As a Retail Specialist assigned primarily to trade accounts, plaintiff was responsible for monitoring and maintaining the inventories of books sold by Western to certain trade customers in the Chicago area

and for developing a small number of relatively small trade accounts in the Chicago area. Plaintiff's primary role as a Retail Specialist was to provide support service to other sales personnel, especially to Midwest Trade Supervisor Richard Nau.

8. Like all other Retail Specialists employed by Western, plaintiff received a base salary plus commissions on sales to her own accounts. Her base salary during 1978 was set at the annual rate of $8,000, the same as the base salaries of most other Retail Specialists, including both males and females. The only Retail Specialists with higher base salaries in 1978 were Brenda Barnett, a woman whose base salary was $8,400, and Robert Schmitz, a man whose base salary that year was $10,000. Schmitz' higher base salary reflected his greater length of service with the company; he had served Western for a number of years as a sales territory manager before being downgraded to the Retail Specialist position. Barnett's higher base salary apparently also was attributable to longer service with the company.

9. Plaintiff's base salary in 1979 was $11,000. This was as high as the base salary of any other Retail Specialist, male or female, except Schmitz, who again received a higher base ($12,000) reflecting his greater longevity with Western.

10. In 1980, plaintiff's last year as a Retail Specialist, she received a base salary of $12,000. The only Retail Specialist who received a higher base salary that year was Schmitz.

11. The commissions paid to plaintiff in 1978, 1979, and 1980 were determined in accordance with a standard schedule of percentage rates that were applied in the same way to all Retail Specialists. The actual dollar amounts of the commissions received by individual Retail Specialists varied only as a result of differences in their volume of sales in relation to their sales budgets.

12. During the period from 1978 through 1980, various bonuses were made available to Retail Specialists. In some

instances, these bonuses were based on the individual Retail Specialist's attainment of specific goals. In other instances, the individual's eligibility for a bonus depended on the achievement of an overall goal by all the sales personnel within his or her assigned territory. All bonuses that were made available to Retail Specialists were made available to males and females on the same terms.

13. Plaintiff alleges that sometime in 1980, while serving as a Retail Specialist, she was initially informed that she would be eligible to receive a certain bonus and then later was told that she would not receive it. There is no evidence, however, that any male classified as a Retail Specialist ever received such a bonus when the plaintiff did not.

14. Western's compensation system for Retail Specialists differed from its compensation system for sales employees classified as "Territory Managers." During the period from 1978 through 1980, Territory Managers received approximately the same base salaries as Retail Specialists with comparable years of service within their classification, but the Territory Managers received substantially greater commission payments and were eligible for certain bonuses and incentive payments that were not available to Retail Specialists. Western's compensation system for Territory Managers, however, was applied equally to both men and women working in the Territory Manager classification.

15. The overall duties and responsibilities of Territory Managers were substantially different from the overall duties and responsibilities of Retail Specialists. In particular, each Territory Manager was directly responsible for a much larger dollar volume of sales than was any Retail Specialist. For example, plaintiff testified that her own accounts in her final year as a Retail Specialist were budgeted at $112,-600. In contrast, Territory Managers during the same period were responsible for budgets ranging from about $500,000 to $2,000,000. Although some Retail Specialists may, in some instances, have been del-

egated responsibilities for writing orders for accounts that were assigned to Territory Managers, the primary accountability for those sales remained with the Territory Managers. Thus, the overall level of responsibility borne by the Territory Managers was much greater than that borne by Retail Specialists.

16. The substance of the work of Territory Managers also differed significantly from that of Retail Specialists, and required different types of knowledge and skills. Territory Managers not only were required to spend a greater percentage of their time in direct selling activities, but also were required to sell to larger and more diverse accounts than Retail Specialists. The evidence establishes that selling to larger accounts requires substantially different skills and experience and a different level of responsibility on the part of the sales person than selling to smaller accounts.

17. During the period while plaintiff was serving as a Retail Specialist, two vacancies occurred in field territory manager positions in the Chicago area. One vacancy occurred when Cedric Turner, the Territory Manager for the "Chicago North" field territory, died. The Chicago North territory was one of the largest, if not the largest, field territory in the United States in terms of dollar volume with an annual budget of approximately 2 million dollars. It included several major wholesale accounts. To replace Turner, Western laterally transferred Mark Redrick, a male who had worked for the Company since 1971. Redrick was serving as a field Territory Manager in the Pittsburgh-Western Pennsylvania market at that time and was experienced in the handling of wholesale and chain accounts.

18. The other field territory manager position in the Chicago area that became vacant while plaintiff was working as a Retail Specialist was the "Chicago South" position, which was held by Dave Lewin until his retirement in 1978 or 1979. The Chicago South territory was budgeted at about $700,000. To replace Lewin, Western laterally transferred Jeff Jones, a male

who had served as a field Territory Manager in the Rocky Mountain Region and was experienced in the handling of all types of accounts, including wholesalers and chain buying offices.

19. Redrick and Jones were clearly better qualified than plaintiff for the field Territory Manager positions in Chicago for which they were selected. · Unlike both Redrick and Jones, plaintiff at that time had not yet ever served as a Territory Manager. Moreover, having worked primarily with trade accounts, plaintiff was not as experienced as Redrick and Jones in presenting Western's full consumer products line, as was required in the field territory managers' positions.

20. There is no evidence that plaintiff was ever considered, or ever asked to be considered, for any Territory Manager position outside the Chicago metropolitan area. Plaintiff had informed Western in writing on her employment application when she was hired that she was not willing to relocate to another geographic area, and at not time during her employment with Western did she ever notify the Company that her intentions in this regard had changed.

21. In the period from 1977 through 1981, approximately 32 men and 32 women served in the Retail Specialist classification at Western. Of the men, approximately 23 were promoted within an average time of about 10.3 months after they began working as Retail Specialists. Of the women, approximately 10 were promoted within an average time of about 29.4 months after they began as Retail Specialists. The Company explained the ·difference in these promotion rates by pointing out that the men, on the whole, were much more willing (or able) to relocate in order to accept promotions when Territory Manager positions in other geographic areas became available. Of the 23 men promoted, at least 16 moved to other territories to accept their new positions. The women, on the other hand, were generally unwilling (or unable) to relocate; therefore, they had to await vacancies in the Territory Manager positions in their own geographic territories before they could be promoted. In fact, every one of the women promoted to Territory Manager remained in the same territory where she had worked as a Retail Specialist. At trial, the Company was able to identify at least 12 women Retail Specialists who had either declined offers of promotion that would have required relocation or had otherwise specifically informed the Company of their unwillingness (or inability) to relocate.

22. Effective in February 1981, Western created a separate Trade Division within its Consumer Products Sales division. On February 9, 1981, plaintiff was promoted to the position of Trade Territory Manager. Her territory encompassed the Chicago area and certain portions of Indiana and Wisconsin, although she did not have responsibility for all of the accounts within her geographic territory.

23. During her first year as a Trade Territory Manager, plaintiff reported to Richard Nau, the Regional Supervisor of the new Trade Division. In addition to the accounts she had serviced as a Retail Specialist, she was assigned responsibility for the Hapco account in Wisconsin and several substantial accounts in the Chicago area, consisting of Kroch's & Brentanos, Marshall Field, and Carson Pirie Scott.

24. In her first year as a Trade Territory Manager (Western's fiscal year 1982),[1] plaintiff achieved only 66 percent of her sales budget and made only $307,208 in sales. Plaintiff and another Trade Territory Manager (Rebecca Furr, whose budget percentage was also 66 percent) achieved the lowest budget percentages in the Trade division in fiscal 1982. Peter Prewitt, with whom plaintiff has sought to compare herself, achieved 104 percent of his budget during fiscal 1982 and made $3,511,006 in sales, thereby attaining the highest budget percentage and the highest total sales in the Trade division.

1. After calendar year 1980, Western calculated compensation on a fiscal year basis. Fiscal 1982 ran from February 1, 1981 through January 31, 1982.

25. Prior to February 1982, Western maintained a separate School and Library (S & L) sales unit within its Consumer Products Sales division. The S & L unit was headed by a National Sales Manager, Thomas Kaiser. Reporting to Kaiser were six Regional Managers, each of whom was responsible for sales of Western products to schools, libraries and "teacher stores" throughout a region of the United States. Each S & L Regional Manager handled certain accounts directly and also supervised a staff of seven or eight independent agents who contracted to serve as sales representatives for Western in specific localities within the region. The S & L unit sold Goldencraft products (special hard-cover editions of Western books made with durable bindings for use in schools and libraries) in addition to the general Western line of books and products.

26. Effective on February 1, 1982 (the beginning of fiscal year 1983), Western, in a move to reduce personnel and overhead costs, merged the School and Library sales division with the Trade division. As this merger was implemented, the existing administrative structure of the S & L unit was preserved (with some modifications) and superimposed over the existing Trade sales force. Thus, Kaiser became the head of the new, combined Trade S & L division, and four of the former S & L Regional Managers were named Regional Managers of Trade/School and Library.[2] As such, they took over responsibility for supervising the Trade Territory Managers within their respective regions, as well as continuing to service their own direct accounts and to supervise from 7 to 14 independent agents who serviced other S & L accounts within their regions.

27. Pursuant to this merger, A. Fred Klein, the former Midwest Regional Manager in the separate S & L division, took over responsibility for supervising the three Trade Territory Managers located within the Midwest Region—i.e., plaintiff in Chicago, Sandra Fiarman in Detroit, and Patricia Stirnkorb in Cincinnati. Klein also continued performing his existing S & L sales and managerial duties. At the time of this merger, Klein was already serving as a Regional Manager with responsibilities covering the entire Midwestern region; he was experienced in supervising other sales people; and he was familiar with the Goldencraft line, as well as Western's other books and products. In contrast, the Territory Managers' experience was limited to much smaller geographic areas; they had not been responsible for supervising other sales representatives; and they had less experience in selling Goldencraft products, and puzzles, games and other nontrade products.

28. Following the merger of the Trade and S & L divisions in February 1982, Klein and Kaiser worked closely with plaintiff and offered her advice and criticism in an effort to improve her sales performance. Among other things, they instructed plaintiff concerning the effective routing of calls on accounts; urged her to handle her major accounts more effectively by calling on them more often, following through on orders, using the cooperative advertising program to stimulate sales, and simplifying certain accounts; and advised her to plan sales calls more effectively (including calling ahead for appointments), make more sales each week, and make at least 15 to 20 sales calls each week. In addition, Klein and Kaiser urged plaintiff to make up for the business failure of one of her larger accounts (Hapco) by selling to Hapco's former accounts in her territory and by developing existing accounts in her territory.

29. Despite this advice and criticism, plaintiff's sales performance throughout fiscal 1983 lagged below her budgeted sales quotas. Still, plaintiff repeatedly failed to make as many sales calls as she

---

**2.** The fifth former S & L Regional Manager, Richard Lapham, was terminated at that time, and the sixth S & L regional manager's position, then being vacant, was eliminated. About the same time, Len Mandl, who had headed the separate Trade division prior to the merger, resigned from Western's employ, and Richard Nau, who had served directly under Mandl as Regional Supervisor in the separate Trade division, was given notice of termination.

had been instructed to make each week. Her own sales call reports to her supervisor show that, in about two thirds of the weeks for which she submitted written reports, she had made less than 15 sales calls. These reports are incomplete, moreover, because plaintiff failed to submit written reports at all for a number of other weeks during the year, despite explicit instructions to do so. She also failed repeatedly to comply with Klein's instructions that she report to him by telephone each Monday morning regarding her sales performance during the preceding week.

30. When Klein and Kaiser traveled with plaintiff during her calls on accounts (as they did periodically with each Trade Territory Manager under their supervision), they often found that she had failed to set up enough appointments in advance or otherwise to prepare adequately to make efficient use of the available time. In one instance, for example, Kaiser accompanied plaintiff on a sales trip to Milwaukee and found that she had set up only one appointment for that day and had no specific plans for the balance of their time. Kaiser then discovered that plaintiff's list of active accounts failed to include a number of Milwaukee bookstores that had been Western Trade customers in the past or were potential new customers, and that plaintiff was unfamiliar with many of those stores.

31. The next time Kaiser accompanied plaintiff on a sales trip to Milwaukee, she ran out of catalogs by early afternoon after making only a few sales calls, thereby precluding any further calls that day. This was the only occasion Kaiser could recall in his career when a sales person had failed to bring along enough catalogs on a scheduled sales trip to get through a single day of selling.

32. Klein, in his travels with plaintiff on sales calls, observed that she often failed to plan her time efficiently and that, during sales calls, she frequently spent too much time in social conversation with the customers' representatives and did not move quickly enough into discussions related directly to business.

33. Despite the advice and criticism provided by Klein and Kaiser, plaintiff's performance failed to show any significant improvement. Finally, in September 1982, Klein met with plaintiff specifically to discuss the problems with her performance. Even after that meeting, however, plaintiff did not consistently make the required minimum of 15 sales calls per week during the remainder of September and October 1982.

34. On November 3, 1982, Klein wrote to plaintiff setting forth a number of specific concerns about her performance and commenting that he had "not seen any improvement in your territory" since their meeting on September 16, 1982, and that "it is apparent to me that you are continuing in a downward slide." Plaintiff responded by letter on November 6, 1982. In that letter, plaintiff took issue with some of Klein's criticisms and offered excuses or attempted explanations for other problems Klein had mentioned. In a number of respects, however, plaintiff admitted the validity of Klein's complaints. Thus, among other things, plaintiff acknowledged that her reporting needed "vast improvement;" that she had "been sporatic [sic] in my Monday call-ins;" and that some of her accounts did "need more work to bring their dollars up." Defendant's Exhibit 12. Plaintiff also stated that she had "a great deal of difficulty dealing with" Klein's insistence that she undertake "more effective preplanning of sales calls and calling ahead for appointments." *Id.* *See also* defendant's Exhibit 11. Plaintiff also acknowledged that she "should have been able to compensate for the dollars" lost when her Hapco account went out of business. *Id.* Later that month, in discussing the contents of these letters with plaintiff, Klein specifically warned her that her job was in jeopardy.

35. In December 1982, plaintiff met with Kaiser at his office to discuss the problems referenced in the letters that had been exchanged between her and Klein. In that meeting, Kaiser reviewed plaintiff's performance over the year and pointed out areas in which he was disappointed; also,

he specifically confirmed her belief that her job was in jeopardy.

36. Because of his concerns about plaintiff's performance earlier in 1982, Kaiser had approached Western's personnel department around May or June to discuss the possibility of terminating plaintiff's employment. He was advised to hold off initiating any such action at that time. Plans were then being developed for a general reorganization of the Trade/S & L division which could be expected to result in the elimination of plaintiff's position. Kaiser was told that termination as a result of a reduction in force would provide plaintiff with severance benefits that she would not receive if discharged for poor performance. Kaiser therefore did not pursue the plaintiff's immediate discharge further at that time.

37. During her first year as a Trade Territory Manager (fiscal 1982), plaintiff received a base salary of $15,000 and incentive payments of $5,312, for total earnings of $20,312. Her base salary was set at the standard level for all territory managers in their first year. Of all the Trade Territory Managers, Bonnie Berkmeier had the highest base salary in fiscal 1982—$18,500. Rebecca Furr, Peter Prewitt, and Christopher Cassel each had a base salary of $16,500 that year. Base salaries above the beginning level of $15,000 were determined on the basis of prior experience and performance.

38. Plaintiff's incentive payments during fiscal 1982 were determined on the basis of a graduated scale of commission rates designed to provide her with approximately $22,000 compensation at the achievement of 90 percent of her sales quota. The commission rates of all other first year Trade Territory Managers were established to achieve the same goal.

39. During her second year as a Trade Territory Manager (fiscal 1983), plaintiff received a base salary of $18,750 and incentive payments of $694 for volume achievement. The $18,750 base salary reflected an increase in the beginning level for Territory Managers, rather than an advance by

the plaintiff to a higher step on the salary scale.

40. Base salaries above the initial level of $18,750 for fiscal 1983 were determined on the basis of prior experience and performance. Some Trade Territory Managers (both males and females) were advanced to a higher base salary level based on these factors. For example, Sandra Fiarman, who had achieved 99 percent of her sales budget in the preceding year, was advanced to a base salary of $20,625 for fiscal 1983. Others (both males and females) were kept at the same level where they had been in fiscal 1982. Bonuses for volume achievement and specific objectives were provided to all Trade Territory Managers, male and female, on equal terms.

41. Although Western's management had been optimistic about potential growth in its trade and school and library business when it merged those two divisions at the beginning of fiscal 1983, it became evident by about April of that year that further reductions in personnel and overhead costs were going to be necessary. Bruce Freise, then Business Manager of Special Markets, was given the task of developing plans to reduce expenses further while still maintaining presence or volume in the Trade Sales area.

42. At the beginning of fiscal 1983 (February 1982), the Trade/S & L division consisted of ten Territory Managers (six women and four men), as well as the four Regional Managers, a National Accounts Manager, a National Sales Manager, and two support staff members. During the course of the year, several personnel actions took place that reduced the number of Trade Territory Manager positions from ten to seven. Specifically, in May 1982, Bonnie Berkmeier, the New York Trade Territory Manager, was promoted to a national accounts position in the field sales division. Her position was then filled by the Philadelphia Trade Territory Manager (Christopher Cassel) and the Philadelphia position was not filled. It was instead handled by the Northeast Regional Manager. About the middle of calendar year 1982,

Rebecca Furr was terminated from the Washington, D.C., Trade Territory Manager position because of poor performance. Her job was not filled but was handled by the Southeast Regional Manager. Also in mid-1982, the Cincinnati trade territory was eliminated due to the loss of the major account in that area. As a result, the Territory Manager (Patricia Stirnkorb) who handled that position was given a lateral transfer to a comparable position in the Consumer Products field sales division due to an immediate opening. The net result of these changes was that by the middle of the year, there were seven Trade Territory Managers (three women and four men).

43. As part of the effort to find ways to reduce personnel and overhead costs still further during 1982, Western began to explore the possibility of contracting out its Goldencraft sales work to a private company. Western opened discussions with Children's Press, Inc., which, by December 1982, resulted in an agreement whereby that company would take over the Goldencraft sales function for Western commencing in February 1983. While these discussions were in process, Freise also began to investigate the possibility of using "telemarketing" (i.e., telephone contacts instead of in-person calls on customers) to service at least some trade accounts.

44. While these steps were underway, Freise, with input and assistance from Thomas Kaiser, also developed plans for various ways to reorganize and further reduce the overall personnel complement of the Trade division. At a meeting in November 1982, higher management considered several alternatives outlined by Freise and ultimately adopted a reorganization plan which called for elimination of all four Regional Manager positions and reduction of the number of Territory Manager positions from seven to five.

45. Under the reorganization plan that Western's managers adopted:

(a) The existing territories in Boston and New York were kept essentially unchanged. Management considered merging those two territories, but rejected the idea because to do so would create a territory with too large a total budget for one sales person.

(b) The existing Philadelphia and Baltimore/Washington, D.C. territories were merged into a single territory.

(c) The Cleveland/Pittsburgh, Detroit, and Chicago territories and Chicago house accounts were merged into a single Midwest territory. Management considered a separate Cleveland/Detroit territory, but rejected it because its total budget would be too small in relation to the budgets for the other territories, given the limited overall number of trade sales people that could be retained.

(d) The existing San Francisco and Los Angeles territories were combined into a single territory.

46. The selections of personnel to fill the five Territory Manager positions remaining after the reorganization were made initially by Freise in consultation with Kaiser, and then were approved by higher management. In making each selection, Freise considered first the extent to which the existing territory was being changed. In Freise's view, if the territory was being kept substantially unchanged and the existing Territory Manager was qualified, then the existing manager should be retained in the position to maintain continuity.

47. Where two or more territories were being combined, Freise, in making his personnel selections, considered the relative qualifications of the incumbents and the location of each candidate within the territory in relation to the location of the accounts with the largest sales volume. Where more than one candidate was well qualified to take over the combined territory, location was given substantial weight, because as Freise explained, "it would not make sense" to retain a person who would have to learn and travel to the majority of the accounts in the territory. (Transcript at 160.)

48. Applying the foregoing considerations, it was decided that Peter Prewitt and Christopher Cassel should be kept on in their positions as Territory Managers in Boston and New York, respectively. Neither territory was being changed significantly, and both Prewitt and Cassel were considered qualified for their positions. Although Prewitt's sales in fiscal 1983 were substantially below his budget, that fact was not considered to render him unqualified to continue in the job. Prewitt's sales in the preceding year had been the highest in the division, both in overall dollars and as a percentage of his budget, and the shortfall in fiscal 1983 was attributable to problems with one account (Walden Books) which constituted so large a portion of his total sales budget that he could not reasonably be expected to make up the difference through sales to other accounts or developing new accounts. Prewitt was not, however, granted any adjustment to his budget or other special consideration as a result of this situation.

49. In the case of the Philadelphia/D.C. territory, the only trade sales person on hand who resided within the territory was Thomas Klusaritz, the Northeast Regional Manager. Richard Faulkner, the Southeast Regional Manager, who had been handling the Washington, D.C., trade accounts since Rebecca Furr's termination earlier in the year, lived outside the territory. Therefore, in accordance with the above criteria, Klusaritz was selected for that Territory Manager position.

50. In the case of the Midwest territory, there were four sales people on hand who resided within the newly-created territory: Fred Klein, then the Midwest Regional Manager, who lived in the Chicago area; plaintiff, then the Territory Manager in Chicago; Sandra Fiarman, then the Territory Manager in Detroit; and Richard Sczepanski, then the Territory Manager in Cleveland. Of these four, only Klein and Fiarman were considered qualified based on performance and experience to manage the newly-merged territory. Neither plaintiff nor Sczepanski had performed well enough in their existing territories to be considered qualified to manage the much larger Midwest territory being created in the reorganization. As between Klein and Fiarman, Klein was located closer to the majority of the accounts and to the accounts with the largest sales volume in the territory. In addition, Klein had an edge over Fiarman in experience and had already served as Regional Manager in the region encompassing most of the newly created Midwest territory. Accordingly, Klein was selected for the Midwest Territory Manager position.

51. In the case of the West Coast territory, both Diane Jordan, then the Territory Manager in San Francisco, and Peter Hausberg, then the Territory Manager in Los Angeles, were considered qualified based on their performance and experience to manage the newly merged territory. The majority of the accounts, however, and most of the larger accounts, were located in the Los Angeles area where Hausberg was located. Therefore, the territory could be covered with less travel time and expense by Hausberg than by Jordan. Accordingly, Hausberg was selected for the West Coast Territory Manager position.

52. As a final element of the reorganization, Robert Barber, who was then the West Coast Regional Manager, was promoted to fill the recently vacated position of Catalog Sales and National Accounts Manager.

53. No other position was available in the Trade division that could be offered to any of the people who were to be displaced by the reorganization. Freise inquired whether any openings existed in the field sales organization at that time, but no field sales position was available either, because the field sales force was also undergoing substantial personnel cutbacks.

54. Plaintiff introduced testimony regarding several remarks allegedly made by Western's managers which, she contends, reflected a general bias on their part against female sales representatives. The evidence, however, reveals only a few, isolated remarks of a teasing or light-hearted

nature, made in casual conversation, which were not intended to harass or disparage the plaintiff or women in general and do not establish any general attitude or policy of bias against women.

55. On January 17, 1983, plaintiff was informed by Messrs. Klein and Kaiser that her employment with Western would be terminated effective January 28, 1983, as a result of changes in the operation of Trade Sales division that had resulted in the elimination of her position. She received her regular pay through January 28, 1983, plus three weeks' severance pay and an adjustment for earned but unused vacation.

56. Plaintiff filed a charge with the Chicago office of the Equal Employment Opportunity Commission on or about July 20, 1983, in which she alleged that Western had discriminated against her on the basis of sex in violation of Title VII. Specifically, the charge alleged that the company discriminated against plaintiff by terminating her and replacing her with a man, retaining a man who had a worse year than she, failing to offer her another position during the reorganization, and failing to promote her as quickly as men. Plaintiff requested a Notice of Right to Sue before the EEOC had completed its investigation and proceeded to file a complaint in this Court on or about November 29, 1983, in which she alleged Western had violated Title VII. On May 23, 1984, plaintiff amended her complaint to allege that Western had also violated the Equal Pay Act "[a]t all times relevant herein" by paying her a lower salary than males performing substantially equal work.

57. Between the dates of her termination from Western in February 1983 and her deposition in this case in May 1984, the plaintiff had a total of four interviews seeking another sales position in the publishing industry. During the eleven months remaining in 1983 after her termination, she made an average of less than two contacts per week with prospective employers. From January through mid-May 1984, she did not look for employment in publishing at all, except for a position with Sharon Publications which she held for about one week. She made no efforts until after May 1984 to find work other than a full time sales position in publishing.

58. To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, they are hereby adopted as conclusions of law.

## II. CONCLUSIONS OF LAW

On the above and foregoing findings of fact, the Court makes the following conclusions of law:

1. This Court has jurisdiction of this action under section 706(f)(3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(3), and under section 16(b) of the Fair Labor Standards Act of 1963, 29 U.S.C. § 216(b).

2. The defendant is an "employer" within the meaning of section 701(b) of Title VII, 42 U.S.C. § 2000e(b), and section 3(d) of the Equal Pay Act, 29 U.S.C. § 203(d).

### A. *Title VII Claims*

#### 1. *Applicable Limitations Period*

3. Section 706(e) of Title VII, 42 U.S.C. § 2000e–5(e), requires that a charge of discrimination be filed with the Equal Employment Opportunity Commission within 180 days after the alleged unlawful employment practice occurred, with certain exceptions where charges are filed with state or local agencies.

4. A discriminatory act which is not made the basis of a timely charge "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

5. Discrete acts of discrimination which occurred more than 180 days prior to the filing of an EEOC charge may not be resurrected and remedied merely because a separate violation occurred within the 180-day period, even if the prior acts occurred

within the two-year back pay period preceding the filing of the charge. *Inda. v. United Air Lines, Inc.,* 565 F.2d 554–58 (9th Cir.1977), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978).

6. In this case, plaintiff filed a timely charge of discrimination under Title VII only with respect to the termination of her employment and the events immediately preceding her termination. The other acts of discrimination which plaintiff alleges occurred at various times during her employment (involving bonuses, promotional opportunities, conduct or remarks of Western employees, assignment of accounts, and shipments, credits and advertising) are discrete acts which were not the subject of timely charges and, even if they had been proven, would be relevant to the Title VII claim only as background evidence. In fact, however, the evidence adduced at the trial does not support the plaintiff's claims that she, or women in Western's Consumer Products Sales division in general, suffered discrimination on the basis of sex in regard to promotions, bonuses or other compensation, work assignments, or any other terms, conditions, or privileges of employment during the period while the plaintiff was employed by Western.

### 2. *Disparate Treatment Theory*

7. With regard to her termination, plaintiff is asserting both the disparate treatment and the disparate impact theories of employment discrimination under Title VII.

8. In an individual disparate treatment case alleging discrimination because of sex in violation of Title VII, the focus is on whether the employer treated the plaintiff less favorably than similarly situated males because of her sex. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

9. The factual inquiry in a Title VII case of disparate treatment is whether the defendant intentionally discriminated against the plaintiff. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *see also U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

10. Proof of discriminatory motive is of paramount importance in a disparate treatment claim. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15.

11. In a Title VII action for sex-based employment discrimination under the disparate treatment theory, the plaintiff has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against her. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *Sherkow v. State of Wisconsin,* 630 F.2d 498, 502 (7th Cir.1980).

12. A division of intermediate evidentiary burdens has been applied in Title VII disparate treatment cases in order to "progressively ... sharpen the inquiry into the elusive factual question of intentional discrimination." *Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct. at 1094 n. 8; *Nellis v. Brown County,* 722 F.2d 853, 856 (7th Cir.1983).

13. Plaintiff has the first intermediate burden of establishing by a preponderance of the evidence a prima facie case of disparate treatment. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 688 (1973).

14. The burden of establishing a prima facie case is intended to force the plaintiff to "demonstrate at least that his rejection did not result from the two most common reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or an absence of a vacancy in the job sought." *Teamsters,* 431 U.S. at 358 n. 44, 97 S.Ct. at 1866 n. 44.

15. In order to establish a prima facie case of discriminatory discharge, plaintiff must meet her burden of proving

by a preponderance of the evidence that she is a member of a protected group and that she was discharged, and produce sufficient evidence of disparate treatment so that the court can infer a causal connection between the plaintiff's sex and the discharge. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

16. In the ordinary discharge case, proof of adequate qualification for the job is a critical element of plaintiff's prima facie case. Plaintiff must show that she was performing her job at a level that met her employer's legitimate expectations. *Huhn v. Koehring Co.*, 718 F.2d 239, 243 (7th Cir.1983); *Lee v. National Can Corp.*, 699 F.2d 932, 936 (7th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983). A showing of satisfactory performance is necessary to raise an inference of discrimination in the ordinary discharge situation, because "[s]atisfactory performance is an ordinary prerequisite of continued employment, just as job qualification is an ordinary prerequisite to hiring." *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir.1977).

17. Where a discharge has occurred in the context of a reduction-in-force, as in this case, plaintiff must show something more than mere satisfactory job performance in order to raise an inference of discrimination. In this context, the focus must necessarily be on plaintiff's "relative" qualifications as compared with those of the persons retained. *Teamsters*, 431 U.S. at 358 n. 44, 97 S.Ct. at 1866 n. 44. *See also Matthews v. Allis-Chalmers*, 35 FEP Cases 1404 (N.D.Ill.1984) (discussing the plaintiff's burden of proof in a reduction-in-force case under the Age Discrimination in Employment Act); *LaGrant v. Gulf & Western Mfg. Co.*, 748 F.2d 1087 (6th Cir.1984) (same). "In the reduction-in-force case, the employer often must discharge qualified employees. The nondiscriminating employer will choose whom to discharge based on their *relative* contributions to the business." *Allis-Chalmers*, 35 FEP Cases at 1405 (emphasis in original).

18. Establishment of a prima facie case merely creates a rebuttable presumption that the employer discriminated against the plaintiff and must not be equated with an ultimate finding of discriminatory treatment. *Burdine*, 450 U.S. at 254 & n. 7, 101 S.Ct. at 1094 & n. 7; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 951 (1978).

19. If the plaintiff succeeds in establishing a prima facie case, the defendant may meet the second intermediate burden by merely articulating some legitimate, nondiscriminatory reason for the plaintiff's discharge. *See Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Furnco*, 438 U.S. at 578, 98 S.Ct. at 2950; *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

20. Shifting the burden of production to the employer serves "to frame the factual issue with sufficient clarity so that plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

21. The employer's burden of articulating a legitimate, nondiscriminatory reason for its action does not require the employer to prove the absence of a discriminatory motive in order to rebut plaintiff's prima facie case. *Sweeney*, 439 U.S. at 24, 25, 99 S.Ct. at 295, 296.

22. The defendant need not persuade the court that it was actually motivated by the proffered reason for plaintiff's discharge. *Burdine*, 450 U.S. at 254–56, 101 S.Ct. at 1094–95; *Sweeney*, 439 U.S. at 25, 99 S.Ct. at 295.

23. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95.

24. In order to rebut plaintiff's prima facie case, the defendant merely must set forth, through admissible evidence, the rea-

son for plaintiff's discharge. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094.

■ 25. The fact that a court may think that the employer misjudged the qualifications of plaintiff does not in itself expose the employer to liability. An employer has discretion to choose among candidates, provided the decision is not based upon unlawful discrimination. *Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096; *Mason v. Continental Illinois National Bank*, 704 F.2d 361, 366 (7th Cir.1983).

■ 26. If defendant carries its burden of production during the second stage by articulating a legitimate, nondiscriminatory reason for plaintiff's discharge, plaintiff's prima facie case is rebutted and the inquiry proceeds to a new level of specificity in the pretext stage. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094.

■ 27. If defendant articulates a legitimate, nondiscriminatory reason for plaintiff's discharge, plaintiff must prove that the proffered reason was a pretext for discrimination. *Burdine*, 450 U.S. at 254–56, 101 S.Ct. at 1094–95; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

28. In the pretext stage, plaintiff's burden of showing pretext merges with her ultimate burden of persuading the court that she has been the victim of intentional discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

29. During the pretext stage, the court "must decide which party's explanation of the employer's motivation it believes." *Aikens*, 103 S.Ct. at 1482.

30. The ultimate burden of persuading the court that defendant intentionally discriminated against plaintiff remains at all times with plaintiff. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *Sweeney*, 439 U.S. at 25 n. 2, 99 S.Ct. at 296 n. 2; *Sherkow v. State of Wisconsin*, 630 F.2d 498, 502 (7th Cir.1980).

■ 31. In this case, plaintiff failed to establish a prima facie case of discriminatory discharge under the disparate treatment theory because she did not prove by a preponderance of the evidence that she was relatively better qualified for a position remaining after the 1983 reorganization than Fred Klein or any other person retained in those positions. In fact, plaintiff failed to prove that she was even performing her job at a level that met her employer's legitimate expectations. Therefore, her evidence would not establish a prima facie case of discrimination even if this were not a reduction-in-force case.

■ 32. Even if plaintiff had met the initial burden of establishing a prima facie case of discriminatory discharge, however, defendant rebutted the prima facie case by articulating legitimate, nondiscriminatory reasons for her discharge: *i.e.*, the elimination of her position due to a reorganization which was compelled by financial difficulties, and her nonselection for the remaining positions due to her poor performance and relative lack of qualifications.

33. Plaintiff failed to prove that the legitimate, nondiscriminatory reasons for her termination which were proffered by defendant were mere pretexts for sex discrimination.

34. Plaintiff failed to satisfy her ultimate burden of persuading the court that defendant intentionally discriminated against her on the basis of sex in violation of Title VII.

### 3. Disparate Impact Theory

■ 35. The disparate impact theory of recovery under Title VII is used to attack employment practices that "are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). In order to establish a claim of sex discrimination under this theory, a plaintiff must show that a facially neutral employment criterion or practice produces a significantly adverse impact on one sex. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). Once that showing is made, the burden shifts to the defendant to show that the employment criterion or practice in question is justified by a legitimate business

**904**

reason. *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853.

36. The disparate impact model is appropriate for use in cases "when an employer has instituted a specific procedure, usually a selection criterion for employment, that can be shown to have causal connection to a class based imbalance in the work force." *Pouncy v. Prudential Insurance Co.*, 668 F.2d 795, 800 (5th Cir. 1982). "Identification by the aggrieved party of the specific employment practice responsible for the disparate impact is necessary so that the employer can respond by offering proof of its legitimacy." *Id.* at 801. For this reason, the disparate impact model is not an appropriate vehicle from which to "launch a wide ranging attack" on the cumulative effect of a complex set of business decisions or employment practices. *Id.* at 800; *Spaulding v. University of Washington*, 740 F.2d 686 (9th Cir.1984).

37. The termination of plaintiff in this case did not result from any specific employment criterion, procedure or practice. Rather, it resulted from the cumulative effect of a complex set of business decisions and judgments which went into the reorganization of Western's Trade sales force. Many factors were involved in deciding which territories to combine and which manager to select for each of the territories that existed after the reorganization. Not the least of these factors was the geography of each territory, including not only its overall size, but also the location of the major accounts within the territory and their proximity to the cities where the existing territory managers resided. These considerations, by their very nature, were unique to each territory. Therefore, the disparate impact model is not suitable for use in this case.

38. Even if the disparate impact model were suitable for use here, in order to establish a prima facie case under that theory, plaintiff would be obliged to show that the policy or practice which caused her termination had a significantly discriminatory impact on women. *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525,

2530, 73 L.Ed.2d 130 (1982). To make this required showing, the number of individuals in each of the groups being compared (*i.e.*, the size of the samples) would have to be large enough to permit the drawing of statistically reliable inferences, and the magnitude of the disparity in the reorganization's effects on men and women would have to be so great as to be unlikely to have occurred absent discrimination. *Teamsters*, 431 U.S. at 340 n. 20, 97 S.Ct. at 1856 n. 20; *Hazelwood School District v. United States*, 433 U.S. 299, 308–312, 97 S.Ct. 2736, 2741–2744, 53 L.Ed.2d 768 (1977).

39. The reorganization in this case affected the positions of only eleven persons (7 Trade Territory Managers and 4 Regional Managers) and resulted in the termination of only five persons (3 women and 2 men). These numbers are too small to give rise to any statistically reliable inferences. *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 622, 94 S.Ct. 1323, 1334, 39 L.Ed.2d 630 (1974) (sample of 13 employees too small); *Soria v. Ozinga Bros., Inc.*, 704 F.2d 990, 995 (7th Cir.1983) (sample involving 15 employees too small). *See also Williams v. Tallahassee Motors, Inc.*, 607 F.2d 689, 693 (5th Cir.1979), *cert. denied*, 449 U.S. 858, 101 S.Ct. 159, 66 L.Ed.2d 74 (1980) ("[T]he smaller the sample size, the greater the likelihood that the [disparity] reflects chance rather than discriminatory practices"); *White v. City of San Diego*, 605 F.2d 455 (9th Cir.1979), quoting *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir.1975) ("[S]tatistical evidence derived from an extremely small universe ... has little predictive value and must be disregarded.") Accordingly, the evidence on this record is insufficient to sustain plaintiff's initial burden of proof under the disparate impact theory.

40. Even if the evidence were sufficient to establish a prima facie case of sex discrimination under the disparate impact theory, defendant has satisfied its rebuttal burden by showing that the reorganization which resulted in plaintiff's termination

was justified by legitimate business reasons. The testimony of Western's managers that the economic problems confronting the company in 1982 and early 1983 necessitated reducing personnel and operating costs in the Trade sales operation is convincing. Defendant's plan to reduce the number of positions by combining territories and functions was a logical response to this economic situation, and the specific decisions defendant reached regarding which territories to combine was reasonable in light of geographic considerations and the relative budgets of the territories involved. Moreover, the evidence shows that the criteria which Western's managers applied in selecting the personnel to be retained after the reorganization were objective and reasonably related to the goals of minimizing operating costs and maximizing continuity and efficiency in carrying on the Trade sales function. There is no showing on this record that any alternative plan or set of criteria was available in which Western could have protected its economic interests with a lesser impact on the women then working in the Trade division.

### B. *Equal Pay Act Claims*

41. Count III of plaintiff's Amended Complaint, in which plaintiff alleges violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), cannot under federal law relate back to the date the original complaint was filed, because the Equal Pay Act claim did not arise out of the conduct, transaction or occurrence set forth in the original pleading. The amendment to the Complaint introduced a new and different cause of action from that outlined in the original Title VII complaint. Moreover, the original complaint did not give defendant such notice of the Equal Pay Act action that defendant would not be prejudiced in maintaining its defense to the action on the merits. The plaintiff's Equal Pay Act claim thus must be deemed to have been filed on May 23, 1984. *See* Fed.R.Civ.P. 15; *Barnes v. Callaghan & Co.*, 559 F.2d 1102, 1106 (7th Cir.1977).

42. An action to recover damages under the Equal Pay Act is barred unless commenced within two years after the cause of action accrued, except where the violation of the Act was "willful," in which case the action may be commenced within three years after the cause of action accrued. 29 U.S.C. § 255.

43. In determining whether a violation was willful, the Seventh Circuit held in an analogous context, that courts should "focus on the defendant's state of mind at the time the allegedly discriminatory acts occurred" and find willfulness "only if there is some showing as to the defendant's knowledge of the illegality of his action." Thus, to prove willfulness, plaintiff "must show that the defendant's actions were knowing and voluntary and that he knew or reasonably should have known" that those actions violated the statute. *Syvock v. Milwaukee Boiler Manufacturing Co.*, 665 F.2d 149, 155–56 (7th Cir.1981) (under the Age Discrimination in Employment Act).

44. Because defendant did not willfully violate the provisions of the Equal Pay Act, the two-year statute of limitations is applicable.

45. Plaintiff's action under the Equal Pay Act is barred to the extent that it seeks to enforce any cause of action for back pay or liquidated damages which accrued before May 23, 1982. Thus, plaintiff's Equal Pay Act claims relating to the period when she worked as a Retail Specialist are time barred, as are any claims relating to her first year as a Territory Manager.

46. The Equal Pay Act of 1963 prohibits an employer from discriminating against employees in an establishment on the basis of sex by paying unequal wages for "equal work the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on

any factor other than sex...." 29 U.S.C. § 206(d)(1).

47. The plaintiff in an action under the Equal Pay Act has the burden of proving that she did not receive equal pay for work substantially equal to that performed by male personnel. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *EEOC v. Mercy Hospital & Medical Center,* 709 F.2d 1195, 1197 (7th Cir.1983); *EEOC v. Kenosha Unified School District No. 1,* 620 F.2d 1220, 1224 (7th Cir.1980).

48. To meet this burden, plaintiff must establish that the work performed by higher-paid males was substantially equal, based on "actual job performance and content—not job titles, classifications or descriptions." *Gunther v. County of Washington,* 623 F.2d 1303, 1309 (9th Cir.1979), *aff'd,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). *See also Hodgson v. Miller Brewing Co.,* 457 F.2d 221, 227 (7th Cir.1972). Establishment of a prima facie case depends on plaintiff's ability to show the performance of equal work, not merely that a wage differential exists and that similar jobs are involved. *Walker v. Columbia University,* 407 F.Supp. 1370, 1374 (S.D.N.Y.1976), *aff'd,* 568 F.2d 953 (2d Cir. 1976).

49. The threshold requirement is that the jobs to be compared must be substantially the same, i.e., that the job content be equal. *Edmondson v. Simon,* 497 F.Supp. 411, 413 (N.D.Ill.1980).

50. Recovery by plaintiff is also predicated on the satisfaction of each of four criteria: "the lower-paying position must require equal *skill, effort* and *responsibility* to that required in the higher-paying position, and must be performed under *similar working conditions.*" *Edmondson,* 497 F.Supp. at 413 (emphasis in original).

51. If plaintiff proves that the employer pays workers of one sex more than those of the opposite sex for equal work, the burden shifts to the employer to show the differential is justified under one of the four exceptions. If the employer establishes one of the four affirmative defenses, it may not be held liable for any differential in wages. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974).

52. An employer may pay newly-hired employees with greater experience more than employees who were newly-promoted to that position, give employees larger raises based on better performance, or base higher wages on an informal seniority system without violating the provisions of the Equal Pay Act. *See, e.g., EEOC v. Whitin Machine Works, Inc.,* 635 F.2d 1095, 1096–97 n. 4 (4th Cir.1980); *EEOC v. Aetna Insurance Co.,* 616 F.2d 719, 723–26 (4th Cir.1980); *Herman v. Roosevelt Federal Savings & Loan Assoc.,* 569 F.2d 1033, 1036 (8th Cir.1978); *Marshall v. St. John Valley Security Home,* 560 F.2d 12, 17 (1st Cir.1977).

53. In this case, plaintiff failed to prove by a preponderance of the evidence that she was paid less than males who performed jobs which were substantially equal. To the extent plaintiff's claims may relate to disparities between the compensation she received as a Retail Specialist and the compensation received by males working as Territory Managers, her claims not only are time-barred, but also must fail because the record shows that the work of Retail Specialists involved substantially less responsibility, and required lesser skills and experience, than that of Territory Managers.

54. To the extent plaintiff's claims rest upon differences between her compensation as a Territory Manager and the compensation paid to male Territory Managers, her claims must fail because defendant proved that any such difference in pay resulted from the consistent application of a compensation system which based earnings on seniority, merit, quantity or quality of production, and other factors other than sex, within the meaning of the exemptions authorized by the Equal Pay Act.

55. To the extent that any of the foregoing conclusions of law are deemed to be findings of fact, they are hereby adopted as findings of fact.

### III. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, it is hereby ordered that:

1. Final judgment is hereby entered in favor of defendants and against plaintiff.

2. Pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, the Court reserves the right to amend the above findings and conclusions or make additional findings and conclusions upon motion of either party made no later than ten days after entry of this order, and the Court may amend the judgment accordingly.

IT IS SO ORDERED.